7 A.3d 84

**Chuckie DONALDSON**

v.

**STATE of Maryland.**

**No. 83, Sept. Term, 2009.**

Court of Appeals of Maryland.

Oct. 26, 2010.

468

470

Kellie M. Black, Assistant Public Defender (Paul B. De-Wolfe, Public Defender, Baltimore), on brief, for petitioner.

Brian S. Kleinbord, Asst. Atty. Gen. (Douglas F. Gansler, Atty. Gen. of Maryland, Baltimore), on brief, for respondent.

Argued before BELL, C.J., HARRELL, BATTAGLIA, GREENE, MURPHY, BARBERA, and ADKINS, JJ.

GREENE, J.

This case involves two distinct issues, both of which require highly fact-specific inquiries. First, we have been asked to determine whether there was probable cause to arrest the petitioner, Chuckie Donaldson ("Petitioner"). To make this determination, we must look at the facts of the arrest and determine whether the totality of the circumstances supported the suppression court's judgment that there was probable cause. The arresting officer testified that he saw Petitioner go with a group of people into a corner in an alley in an area where drug dealing was known to take place. The officer said that he saw Petitioner pull a plastic bag from the rear of his pants, take small white objects from the bag, and exchange the objects for money. The officer also said that, based on his experience and training, he believed that this was a drug transaction. Based on the record before us, we shall affirm the trial court's judgment that there was probable cause to arrest Petitioner.

Second, we have been asked to determine whether two statements made by the prosecutor during closing arguments were improper and require a reversal of Petitioner's conviction. For this determination, we must look at the allegedly improper statements to determine whether they were improper and, if so, whether we are persuaded, beyond a reasonable doubt, that the cumulative effect of these statements did not prejudice Petitioner. In the first statement, the prosecutor argued that the jury should believe the police officers who testified against Petitioner because "[t]hey want to keep their job" and because "what gets them to keep their job" is "their credibility and their integrity." In the second statement, the prosecutor stated that drug dealers are "the root of all evil" and that Petitioner was "the problem." We shall conclude

that both of these statements were improper, and we cannot say that the cumulative effect of these statements did not prejudice Petitioner. Accordingly, we shall reverse Petitioner's conviction and remand the case for a new trial.

## PROCEDURAL HISTORY

This case originated in the Circuit Court for Baltimore City. Petitioner was arrested on December 18, 2006, and was charged with distribution of heroin, possession of heroin with intent to distribute, and simple possession of cocaine. Petitioner subsequently requested suppression of the items seized during his arrest, arguing that there had been no probable cause for the arrest. Following a suppression hearing, the trial court denied Petitioner's motion. A jury trial was held, and, at the end of the trial, Petitioner was convicted of possession of heroin with intent to distribute and acquitted of distribution of heroin.[1] The trial judge subsequently sentenced Petitioner to a prison term of 12 years.

Petitioner entered a timely appeal to the Court of Special Appeals. On May 20, 2009, the intermediate appellate court filed an unreported opinion affirming the judgment of the trial court. *Donaldson v. State*, No. 1739 (Md.Ct.Spec.App.2009). Petitioner then submitted a petition for certiorari to this Court, and we granted the petition. *Donaldson v. State*, 410 Md. 165, 978 A.2d 245 (2009).

## FACTS

Petitioner was arrested in Baltimore City. As a result of a search of Petitioner's person, the police seized fourteen small, white capsules filled with a white powder. A suppression hearing and trial followed.

### Suppression Hearing

Petitioner requested suppression of the items seized as a result of his arrest; thus, a suppression hearing was held on

---

1. The State entered a *nolle prosequi* in regard to the cocaine charge.

September 10, 2007. At the suppression hearing, the State presented the testimony of Detective Troy Taylor ("Taylor"). Taylor first testified to his 12 years of experience as a police officer, his ongoing narcotics training, the hundreds of narcotics-related arrests he had made, his familiarity with the packaging and sale of narcotics in Baltimore City, and his observation of over a thousand narcotics transactions in Baltimore City. He also explained that he had previously testified as an expert on the sale, identification, use, and distribution of controlled dangerous substances ("CDS") in state and federal courts. Based on this testimony, the Court accepted Taylor as an expert on the street level distribution of heroin.

Detective Taylor then testified about the events leading up to Petitioner's arrest. He explained that he and Detective John Rice ("Rice") were sitting in an unmarked vehicle on the 1800 block of West Lombard Street in Baltimore City, and Taylor was monitoring the area with binoculars. From approximately half a block away, Taylor saw Petitioner and four other people walk to a corner near an alley on the 100 block of Addison Street. Taylor was not acquainted with Petitioner. Taylor then saw Petitioner reach into the "rear of his pants" to retrieve a clear plastic bag containing several small, white objects. Petitioner removed some of the objects from the bag, and two people in the group handed Petitioner money in exchange for the objects. After the four people walked away, Petitioner returned the plastic bag to the rear of his pants.

Taylor testified that based on his training and experience, he believed he had just witnessed the sale of narcotics. When asked on cross-examination whether the white objects may have been candy, Taylor testified:

> That would be a weird way to keep your candy to sell on the street. In the rear of your pants. If you conceal something in that way, you are concealing something that is illegal, most of the time. From my training, expertise and observation of hundreds of arrests of the same character.

Taylor then testified that, upon seeing this transaction, he drove towards Petitioner. Taylor and Rice then exited the

car, told Petitioner to stop, and told Petitioner that he was under arrest. Petitioner complied with Taylor's order, and Taylor arrested him. Neither Taylor nor Rice attempted to arrest the other individuals they had seen walking with Petitioner, including the individuals who had apparently purchased items from Petitioner. During the arrest, Taylor asked Petitioner if he wanted Taylor to get the plastic bag out of Petitioner's pants or if Petitioner would get it himself. Taylor retrieved a pair of latex gloves from the trunk of his car and put them on, after which Petitioner pulled the plastic bag from the rear of his pants and gave it to Taylor. The bag contained 14 gelatin capsules filled with a white powder. Taylor suspected that the powder was heroin.

Finally, on cross-examination, Taylor explained his understanding of the drug activity in the area of Petitioner's arrest. Taylor stated that he had worked in that area for 12 years, and he recalled in his testimony that he thought he had made an arrest there earlier on the day of Petitioner's arrest. He also stated that as of the date of his testimony, in September of 2007, "[n]obody's dealing in the block" because drug activity in the "block has since been shut down" and had been shut down "[f]or the last eight, nine, ten months."

## Trial

Petitioner's trial took place on September 18, 2007. Detective Taylor was the State's first witness, and his testimony at trial was consistent with his testimony at the suppression hearing. Taylor again testified to his experience and training with CDS and was accepted as an expert on the sale, use, identification, and distribution of CDS, especially heroin. He also testified to the events leading up to Petitioner's arrest. On cross-examination, Taylor was asked why he did not arrest, or attempt to arrest, any of Petitioner's companions. Taylor explained that he did call for an arrest team to detain the buyers, but no officers responded to the call. As Taylor had not mentioned this fact in his statement of probable cause, counsel for Petitioner asked him if it was true that there was "no proof that they exist, these people who bought drugs from

[Petitioner]." Taylor responded that there was the "[p]roof that I am testifying to." Taylor also explained:

It's more essential for me to get someone who is selling drugs. I think that's more of the problem than the person that's buying drugs. The person that's buying drugs needs help. The person selling drugs is the person that's *the root of the evil* as I put it because if they weren't there, the person wouldn't be there buying the drugs.

(Emphasis added.).

In addition to Taylor, Detective Rice and a Baltimore City Police Department chemist testified. Like Taylor, Rice was accepted as an expert in the sale, identification, use, and distribution of CDS, specifically heroin. He also testified about the events leading up to Petitioner's arrest. Detective Rice's testimony was consistent with Taylor's testimony. The chemist was accepted as an expert in the area of chemical analysis of CDS. She testified that she tested 10 of the capsules seized during Petitioner's arrest and concluded that the capsules contained heroin. The State's physical evidence at trial consisted of a map of the area where Petitioner was arrested, the 14 capsules that Taylor recovered from Petitioner during the arrest, a photograph of the plastic bag that contained the capsules, with the capsules inside, and the chemist's analysis of the powder inside the capsules, which she herself had tested. Petitioner rested without presenting any evidence.

At the end of the trial, counsel for both the State and Petitioner presented closing statements, portions of which are at issue in this case. In his closing argument, the prosecutor stated:

Now, Detective Taylor testified and I thought it was interesting, he said that drug dealers are *the root of all evil.*

(Emphasis added.). Counsel for Petitioner objected, and the court overruled the objection. The prosecutor continued:

He didn't go after the buyers that day because his objective was to stop the distribution of heroin. He also testified that buyers alone need help. If there wasn't any drug dealers,

they wouldn't be selling the drugs, and the buyers wouldn't need the help. *So the problem today is seated over there.* (Emphasis added.).

During his own closing arguments, counsel for Petitioner stated:

So, where is the proof, ladies and gentlemen of the jury? You heard from Detective Taylor, because I say it's so, that's good enough. He doesn't need to take pictures of anybody while the[y're] distributing drugs. Why should we do that? Maybe because it would prove the point that someone is trying to make. Why aren't there any pictures? A simple picture that he's guilty. See, back at the [sic], you would be able to take back with you into the jury room—there was a picture taken of the narcotics, but no, we can't take a picture of someone who is trying to sell drugs out on the street. That would be too much. We don't want to videotape them either because our word is good enough. You need to believe us. You don't need anything to support this. Just believe what I say because I'm a police officer. That's what this case is about.

Finally, in rebuttal during her closing arguments, the prosecutor stated:

[Defense counsel] said that Detective Taylor said, believe it because I said it's so. No, that's not what he said. He said, I stood up here and I said it's the truth, the whole truth, and nothing but the truth. We all have integrity, and we all have—the only thing that we have is our credibility. This officer has been an officer for 12 year[s]. Detective Rice has been an officer for six years. When they get on the stand, they say, I tell the truth, the whole truth, and nothing but the truth. They're not going to get on the stand and lie. One, they want to keep their job.

Defense counsel objected and moved to strike the prosecutor's statement. The court overruled the objection, and the prosecutor continued:

Number two, that's what gets them to keep going with the job is their credibility and their integrity. He got on the

stand and said, don't believe it because I say it. Believe it because I'm standing up here and saying, I'm telling the truth. He said that on December 18, 2006, he observed the Defendant in the 1800 block of W. Lombard Street with a group of people following him, and he was handing out drugs from his rear area.

The jury found Petitioner guilty of possession of heroin with intent to distribute and not guilty of distribution of heroin, and the trial judge sentenced him to 12 years in prison. Petitioner appealed his conviction to the Court of Special Appeals, where he presented three issues for review, two of which are relevant here.[2] First, Petitioner argued that there was no probable cause justifying his arrest and that, accordingly, the trial court should have granted his motion to suppress the evidence recovered pursuant to his arrest. The intermediate appellate court rejected this argument, concluding "that it was entirely reasonable for Detective Taylor to infer that [Petitioner] was involved in street level drug distribution." Second, Petitioner asserted that the prosecutor made improper statements during closing arguments. The Court of Special Appeals also rejected this argument. In regard to the prosecutor's statement that Taylor would not lie because police officers "want to keep their job," the court concluded that this remark was improper, but that the trial court committed harmless error when it overruled the objection to the remark. As for the prosecutor's statement that "drug dealers are the root of all evil," the court concluded that this remark was "improper in isolation," but not "when viewed in the context of the prosecutor's entire closing argument."

Petitioner submitted a petition for certiorari to this Court, which we granted to answer these two questions:

1. Does the exchange of money for an unidentified item support probable cause to arrest?

---

**2.** Petitioner also argued that his speedy trial rights had been violated. The Court of Special Appeals rejected this argument and Petitioner has not asked us to address that issue.

2. Did the trial court err in allowing the prosecutor, in closing argument, to vouch for the credibility of the two police officers who testified for the State and to appeal to the jury to convict Petitioner in order to help remedy the drug problem?

Under the facts of this case, we answer both questions in the affirmative.

## DISCUSSION

### I.

### Probable Cause to Arrest

 Petitioner's first argument is that his arrest was not supported by probable cause and that, as a result, the items seized during the arrest should have been suppressed. Specifically, Petitioner argues that the exchange of money for an unidentified item does not, in an of itself, establish probable cause to arrest. The trial court and Court of Special Appeals both ruled that there was probable cause for the search considering all the circumstances leading up to Petitioner's arrest. We agree with both courts.

 The Fourth Amendment to the United States Constitution protects citizens from "unreasonable searches and seizures." U.S. CONST. amend. IV; *see also Mapp v. Ohio*, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (applying the Fourth Amendment to the States). A warrantless arrest made in a public place is not unreasonable, and accordingly does not violate the Fourth Amendment, if there is probable cause to believe that the individual has committed either a felony or a misdemeanor in an officer's presence. *Longshore v. State*, 399 Md. 486, 501, 924 A.2d 1129, 1137 (2007) (citing *U.S. v. Watson*, 423 U.S. 411, 418, 96 S.Ct. 820, 825, 46 L.Ed.2d 598, 606 (1976)). Once the police have executed a valid arrest supported by probable cause, they may then also conduct a search of the individual being arrested without obtaining a warrant, so long as the search does not involve a bodily intrusion. *Paulino v. State*, 399 Md. 341, 350, 924 A.2d 308,

314 (2007) (citing *Schmerber v. California,* 384 U.S. 757, 769, 86 S.Ct. 1826, 1835, 16 L.Ed.2d 908, 919 (1966)).

The relevant question in a case concerning the reasonableness of a search incident to a warrantless arrest is therefore whether the police had probable cause to support the arrest. The Supreme Court described the probable cause assessment in *Maryland v. Pringle:*

> To determine whether an officer had probable cause to arrest an individual, we examine the events leading up to the arrest, and then decide 'whether these historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to' probable cause.

540 U.S. 366, 371, 124 S.Ct. 795, 800, 157 L.Ed.2d 769, 775 (2003) (citation omitted).

We explained the quantum of facts necessary to establish probable cause for a warrantless arrest in *State v. Wallace:*

> Probable cause, we have frequently stated, is a nontechnical conception of a reasonable ground for belief of guilt. A finding of probable cause requires less evidence than is necessary to sustain a conviction, but more evidence than would merely arouse suspicion. Our determination of whether probable cause exists requires a nontechnical, common sense evaluation of the totality of the circumstances in a given situation in light of the facts found to be credible by the trial judge. Probable cause exists where the facts and circumstances taken as a whole would lead a reasonably cautious person to believe that a felony had been or is being committed by the person arrested. Therefore, to justify a warrantless arrest the police must point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warranted the intrusion.

372 Md. 137, 148, 812 A.2d 291, 297–98 (2002) (quoting *Collins v. State,* 322 Md. 675, 680, 589 A.2d 479, 481 (1991) (citations omitted)). When we review a trial court's ruling on a motion to suppress for lack of probable cause, we consider only the

evidence contained in the record of the suppression hearing. *Bost v. State*, 406 Md. 341, 349, 958 A.2d 356, 361 (2008).

We are unaware of any cases in which we have addressed the specific question of whether probable cause exists to arrest an individual who exchanges an unidentified item or items for money. The Court of Special Appeals, however, recently addressed this very issue in *Williams v. State*, 188 Md.App. 78, 981 A.2d 46 (2009), *cert. denied*, 411 Md. 742, 985 A.2d 539 (2009). In *Williams*, a Baltimore City detective was watching video from a surveillance camera trained on an area that the detective described as an "open-air drug market." 188 Md.App. at 83, 981 A.2d at 48. The detective saw the defendant take an unknown object from "somewhere between [his] waist and the rest of his upper torso" and exchange the object for what the detective believed to be money. *Williams*, 188 Md.App. at 84, 981 A.2d at 49. The defendant and the buyer also attempted to conceal the item during the exchange. *Williams*, 188 Md.App. at 84–85, 981 A.2d at 49–50. Based on his specialized training and experience, the detective concluded that he had witnessed a drug transaction and dispatched officers to arrest the defendant, who was discovered to have crack cocaine. *Williams*, 188 Md.App. at 84–85, 981 A.2d at 50.

As in *Williams*, the facts adduced during the probable cause hearing in the present case established probable cause for Detective Taylor to believe that Petitioner had committed a felony—i.e., selling a CDS. As Petitioner acknowledges in his brief, Taylor testified that Petitioner was walking with a group of people, removed a clear bag from the rear of his pants, took two small white objects from that bag, and exchanged those objects for money. Petitioner has argued that the objects in the bag could have been something other than contraband, such as candy, but as Taylor testified at the suppression hearing, Petitioner's method of keeping the items in a plastic bag in the rear of his pants was undoubtedly suspicious. Taylor also testified that Petitioner and the other individuals were gathered in a corner by an alleyway when they made this exchange. While this, by itself, does not necessarily suggest

illegal activity, it certainly supports the conclusion that the group was engaged in some activity they wanted to conceal. Taylor further testified that he believed he had made a drug arrest the same day on the same block and that the area was a high drug area at the time of Petitioner's arrest. This, too, adds support to Taylor's conclusion that Petitioner had engaged in a drug sale. Finally, Taylor detailed his extensive training and experience with narcotics transactions, especially in the area of Petitioner's arrest. Based on this experience, Taylor concluded that Petitioner had most likely engaged in a drug sale. In our view, these facts were sufficient to establish probable cause to believe that a crime had just been committed.

Petitioner contends that there are significant differences between the facts in *Williams* and the facts in the present case. Specifically, he argues that his arrest did not occur in an "open-air drug market" where "drugs are often being sold" and that neither Petitioner nor the other individuals involved in the suspect transaction attempted to conceal the items being sold. We disagree with these contentions. Petitioner's first argument is simply inconsistent with Taylor's testimony. Taylor testified that drug activity in the area where Petitioner was arrested had been shut down "since" Petitioner's arrest. He did not specify when the drug activity was shut down, but it was clearly after Petitioner's arrest, not before. For there to have been drug activity to be shut down in the area of Petitioner's arrest "since" the arrest, there must have been drug activity to shut down in that area.[3] Indeed, Taylor testified that he believed that he had arrested someone for selling drugs in that area earlier in the day of Petitioner's

---

**3.** The suppression hearing took place on September 10, 2007. At the hearing, Detective Taylor stated that the drug trade in the area of Petitioner's arrest had been shut down "[f]or the last eight, nine, ten months." This means that the drug trade had been shut down since between November 2006 and January 2007. Petitioner was arrested on December 18, 2006, and Taylor stated that he made another drug arrest on or around that same date. The drug trade must have been ongoing as of December 18, 2006, and shut down some time later in the "eight, nine, ten month[ ]" span to which Taylor testified.

arrest. As for the lack of concealment, we do not consider that fact to be dispositive in this case. Taylor testified that what he saw looked like a drug transaction, based on his extensive experience, and his description of the transaction is certainly consistent with a drug deal. The participants in the sale collected in a corner by an alleyway, and Petitioner retrieved the small, white items from a plastic bag in the rear of his pants. The participants may not have attempted to hide the items or money specifically, but these facts, when viewed in conjunction with the other circumstances of the exchange, suggest that this was an exchange that the parties wanted to conceal from the public.

Petitioner's argument that there was no probable cause also focuses heavily on his assertion that there are few, if any, decisions holding that a furtive exchange of money for an unknown substance establishes probable cause. He cites a number of cases in which other courts have concluded that no probable cause to arrest existed when the defendant had engaged in a furtive exchange of unidentified items. None of these cases affect our decision here. In two of the cases Petitioner cites, the Supreme Court of Pennsylvania concluded, based on the facts before that court, that there was no probable cause to arrest an individual who exchanged unidentified, small objects for money. *Commonwealth v. Dunlap*, 596 Pa. 147, 941 A.2d 671 (2007) (police saw the defendant exchange money for an unknown object in an high-crime neighborhood); *Commonwealth v. Banks*, 540 Pa. 453, 658 A.2d 752 (1995) (police saw the defendant exchange money for an unknown object and the defendant fled when approached by the police). Like the present case, the defendant in both of these cases exchanged an unidentified small object for money; however, in contrast to the present case, the circumstances of the exchanges in the Pennsylvania cases did not suggest that drug sales had taken place. *See Dunlap*, 941 A.2d at 679; *Banks*, 658 A.2d at 752-53. Furthermore, a more recent case from the Pennsylvania court demonstrates that under the proper circumstances a single transaction of unidentified objects can constitute probable cause. In *Commonwealth v.*

*Thompson,* the court concluded that there was probable cause to arrest an individual who exchanged an unidentified item for money. 604 Pa. 198, 985 A.2d 928, 936–37 (2009). *Thompson* shows that *Dunlap* and *Banks* stand only for the unremarkable proposition that probable cause to arrest does not always exist when an individual exchanges small, unidentified objects for money. Probable cause to arrest may exist, however, if the totality of the circumstances supports the conclusion that the exchange was probably unlawful.

Petitioner also cites a number of other cases in which courts have concluded that there was no probable cause to arrest an individual who was seen engaging in a transaction of small, unidentified objects for money. *See, e.g., People v. Ratcliff,* 778 P.2d 1371 (Colo.1989) (defendant apparently exchanged unidentified items with a known drug dealer outside a bar which did not provide probable cause for arrest); *Cunha v. Super. Ct.,* 2 Cal.3d 352, 85 Cal.Rptr. 160, 466 P.2d 704 (1970) (there was no probable cause for arrest where the defendant apparently exchanged an unseen object with another individual in an area where the police had conducted thirty to forty narcotics arrests in the previous three months); *Howard v. State,* 623 So.2d 1240 (Fla.Dist.Ct.App.1993) (there was no probable cause for arrest where the defendant gave money to another person, with whom he subsequently bumped his hand, in a neighborhood where there had been numerous complaints of drug sales); *Winters v. State,* 578 So.2d 5 (Fla.Dist.Ct.App. 1991) (there was no probable cause for arrest where the defendant gave money to the driver of a car in an area with a high rate of drug activity); *Filitti v. Super. Ct.,* 23 Cal.App.3d 930, 100 Cal.Rptr. 583 (1972) (an officer saw the defendant in possession of a plastic bag, a brown paper bag, and an open shoe box, but the officer admitted he had "no idea what was in" the containers therefore there was no probable cause for arrest). In none of these cases did either party to the transaction do anything as suspicious as going to a corner in an alley, in an area where drug transactions were common, and pulling the items to be exchanged from a plastic bag hidden in the back of his or her pants.

We also disagree with Petitioner's contention that there are few cases in which courts have found probable cause when the defendant exchanged an unidentified item or items for money. The State points to many other courts that have concluded that, when taking into account the totality of the circumstances, there can be probable cause to arrest in such a case. One such case, of course, is the Court of Special Appeals's decision in *Williams*. Other courts have come to a similar conclusion. *See, e.g., State v. Castro,* 891 A.2d 848 (R.I.2006) (defendant had a brief encounter with another person in a high crime area where a small white bag was exchanged for money); *State v. Moore,* 181 N.J. 40, 853 A.2d 903 (2004) (defendant exchanged unidentified items for money in a vacant lot in a high crime area); *Darling v. State,* 768 A.2d 463 (Del.2001) (defendant engaged in two exchanges of unidentified objects while wearing a mask in an open-air drug sale area); *Davis v. U.S.,* 781 A.2d 729 (D.C.2001) (defendant, displaying unidentified items to an individual known for illegal activity, was interrupted during an apparent exchange of money for the items); *Commonwealth v. Kennedy,* 426 Mass. 703, 690 N.E.2d 436 (1998) (defendant, in a "high drug area," exchanged unseen items with a known drug dealer who ran from defendant's car to a house and back); *People v. Jones,* 90 N.Y.2d 835, 660 N.Y.S.2d 549, 683 N.E.2d 14 (1997) (defendant exchanged unidentified items in a high crime area and then secreted a plastic bag at a construction site); *Commonwealth v. Santaliz,* 413 Mass. 238, 596 N.E.2d 337 (1992) (defendant, in an area known for drug activity, took an unidentified item from another person, who had the item in her waistband, and silently exchanged it for money with a person who arrived and left in a taxi); *Baker v. State,* 531 A.2d 1235 (Del.1987) (defendant exchanged an unidentified object for money in a high crime area and fled from the police); *Tobias v. U.S.,* 375 A.2d 491 (D.C.1977) (defendant twice exchanged unidentified objects for money, was interrupted during a third exchange, and fled from the police); *Revels v. State,* 666 So.2d 213 (Fla.Dist.Appl.Ct.1995) (defendant exchanged money for unidentified objects at a house where there had been numerous

narcotics arrests in the past and two previous transactions the same night).

We agree with these cases that there can be probable cause to arrest an individual who has exchanged an unidentified item for money, if the totality of the circumstances supports the conclusion that the exchange involved an unlawful substance. As we have explained, the totality of the circumstances in the present case supported that conclusion. We accordingly conclude that there was probable cause to arrest Petitioner; therefore, the trial court and Court of Special Appeals were both correct when they determined that the items seized during his arrest were admissible.

## II.

### Statements Made During Closing Arguments

Petitioner also argues that he deserves a new trial because of statements that the prosecutor made during closing arguments. He contends that the prosecutor both improperly vouched for the credibility of Detectives Taylor and Rice and improperly urged the jury to convict Petitioner to combat the drug problem in Baltimore City. We agree that these statements were improper. We further conclude that these statements may have influenced the jury's verdict and that Petitioner therefore deserves a new trial.

Closing arguments are an important aspect of trial, as they give counsel "an opportunity to creatively mesh the diverse facets of trial, meld the evidence presented with plausible theories, and expose the deficiencies in his or her opponent's argument." *Henry v. State*, 324 Md. 204, 230, 596 A.2d 1024, 1037 (1991). In *Lee v. State*, we quoted the Supreme Court of the United States on the purpose and importance of closing arguments:

It can hardly be questioned that closing argument serves to sharpen and clarify the issues for resolution by the trier of fact in a criminal case. For it is only after all the evidence is in that counsel for the parties are in a position to present their respective versions of the case as a whole. Only then

can they argue the inferences to be drawn from all the testimony, and point out the weaknesses of their adversaries' positions. And for the defense, closing argument is the last clear chance to persuade the trier of fact that there may be reasonable doubt of the defendant's guilt.

The very premise of our adversary system of criminal justice is that partisan advocacy on both sides of a case will best promote the ultimate objective that the guilty be convicted and the innocent go free.

405 Md. 148, 161–62, 950 A.2d 125, 132–33 (2008) (quoting *Herring v. N.Y.,* 422 U.S. 853, 862, 95 S.Ct. 2550, 2555, 45 L.Ed.2d 593, 600 (1975)).

In keeping with the importance of closing argument, we have explained that counsel are afforded "great leeway" when presenting that portion of their case. *Degren v. State,* 352 Md. 400, 429, 722 A.2d 887, 901 (1999); *Henry,* 324 Md. at 230, 596 A.2d at 1037. We explained in *Spain v. State:*

The prosecutor is allowed liberal freedom of speech and may make any comment that is warranted by the evidence or inferences reasonably drawn therefrom. In this regard, generally, ... the prosecuting attorney is as free to comment legitimately and to speak fully, although harshly, on the accused's action and conduct if the evidence supports his comments, as is accused's counsel to comment on the nature of the evidence and the character of witnesses which the [prosecution] produces.

\* \* \*

While arguments of counsel are required to be confined to the issues in the cases on trial, the evidence and fair and reasonable deductions therefrom, and to arguments of opposing counsel, generally speaking, liberal freedom of speech should be allowed. There are no hard-and-fast limitations within which the argument of earnest counsel must be confined—no well-defined bounds beyond which the eloquence of an advocate shall not soar. He may discuss the facts proved or admitted in the pleadings, assess the conduct of the parties, and attack the credibility of wit-

nesses. He may indulge in oratorical conceit or flourish and in illustrations and metaphorical allusions.

386 Md. 145, 152–53, 872 A.2d 25, 29 (2005) (quoting *Degren,* 352 Md. at 429–30, 722 A.2d at 901–02).

 Great leeway notwithstanding, not all statements are permissible during closing arguments. As we explained in *Mitchell v. State:*

> For instance, counsel may not 'comment upon facts not in evidence or . . . state what he or she would have proven.' It is also improper for counsel to appeal to the prejudices or passions of the jurors, or invite the jurors to abandon the objectivity that their oaths require.

408 Md. 368, 381, 969 A.2d 989, 997 (2009) (citations omitted). It is also improper for counsel to make "golden rule" arguments in which counsel asks the jury to put themselves in the shoes of the victim, *Lee,* 405 Md. at 171, 950 A.2d at 138, *Hill v. State,* 355 Md. 206, 215, 734 A.2d 199, 204 (1999), or for counsel to vouch for or against the witnesses' credibility, *Spain,* 386 Md. at 153, 872 A.2d at 30.

### A.

### Vouching for Witnesses' Credibility

 Petitioner argues that the prosecutor in the present case improperly vouched for the credibility of Detectives Taylor and Rice during closing arguments. The Court of Special Appeals agreed with the Petitioner on this point and so do we.

In *Spain,* we discussed the problems inherent to vouching for witnesses during closing arguments:

> [O]ne technique in closing argument that consistently has garnered our disapproval, as infringing on a defendant's right to a fair trial, is when a prosecutor 'vouches' for (or against) the credibility of a witness. Vouching typically occurs when a prosecutor 'places the prestige of the government behind a witness through personal assurances of the

witness's veracity ... or suggests that information not presented to the jury supports the witness's testimony.' 386 Md. at 153–54, 872 A.2d at 30 (citations omitted); *see also Walker v. State,* 373 Md. 360, 403–04, 818 A.2d 1078, 1103–04 (2003) (finding improper vouching to have occurred where a prosecutor made assertions, based on personal knowledge, that a witness was lying).

The Supreme Court has recognized the dangers that prosecutorial vouching presents:

[S]uch comments can convey the impression that evidence not presented to the jury, but known to the prosecutor, supports the charges against the defendant and can thus jeopardize the defendant's right to be tried solely on the basis of the evidence presented to the jury; and the prosecutor's opinion carries with it the imprimatur of the Government and may induce the jury to trust the Government's judgment rather than its own view of the evidence.

*U.S. v. Young,* 470 U.S. 1, 18–19, 105 S.Ct. 1038, 1048, 84 L.Ed.2d 1, 14 (1985).

Petitioner specifically takes issue with the prosecutor's statements, as part of her rebuttal argument during closing arguments, that Detectives Taylor and Rice were "not going to get up on the stand and lie" because "they want to keep their job" and that "what gets [Taylor and Rice] to keep going with the job is their credibility and their integrity." Petitioner argues that by making these statements, the prosecutor improperly "vouched for the credibility of the State's two primary witnesses." Petitioner points to our decision in *Spain* for support. In *Spain,* the prosecutor made statements during closing arguments that were similar to the ones made by the prosecutor in the present case, stating:

The Officer in this case would have to engage in a lot of lying, in a lot of deception and a conspiracy of his own to come in here and tell you that what happened was not true. He would have to risk everything he has worked for. He would have to perjure himself on the stand.

\*　　\*　　\*

[Y]ou have to understand that Officer Williams has no motive to lie, because he has everything to risk in this case.

386 Md. at 151–52, 872 A.2d at 28–29.

We concluded that the prosecutor's statements in *Spain* were improper for two reasons. First, we concluded that the prosecutor had improperly relied on facts not in evidence:

Courts consistently have deemed improper comments made during closing argument that invite the jury to draw inferences from information that was not admitted at trial. Although the notion of adverse personnel implications flowing from perjured testimony by a police officer resonates at a common sense level, at no time during the trial scrutinized in the present case did the State introduce evidence from which it could be inferred ineluctably that [the police officer] risked his career or any of its benefits if he were to testify falsely.

*Spain*, 386 Md. at 156, 872 A.2d at 31–32 (citations omitted); *see also Hill*, 355 Md. at 222, 734 A.2d at 208 (stating that "counsel is not permitted to comment [during closing arguments] on facts not in evidence or state what *could* have been proven...").

We further concluded that even if the prosecutor had relied on facts in evidence, he had engaged in improper vouching:

Although the State is free to highlight the incentive, or lack of incentive, of a witness to testify truthfully, courts consistently have held that it is improper to argue that a police officer may be deemed more credible simply because he or she is a police officer. By invoking unspecified, but assumed, punitive consequences or sanctions that might result if a police officer testifies falsely, a prosecutor's arguments imply that a police officer has a greater reason to testify truthfully than any other witness with a different type of job. Although the fact finder generally is made aware that a witness who is a police officer is testifying as to events witnessed while on duty as a police officer, a prosecutor must be careful not to insinuate that the credibility of

statements made in this capacity may be assessed at a level of scrutiny other than that given to all witnesses.

*Spain,* 386 Md. at 157–58, 872 A.2d at 32 (citations omitted).

Looking at the statements that the prosecutor made in the present case, we conclude that they were improper. We recognize here, as we did in *Spain,* that "[p]art of the analysis of credibility involves determining whether a witness has a motive or incentive not to tell the truth," and that, as a result, counsel "feel[s] compelled frequently to comment on the motives, or absence thereof, that a witness may have for testifying in a particular way, so long as those conclusions may be inferred from the evidence introduced and admitted at trial." 386 Md. at 154–55, 872 A.2d at 30–31. As discussed above, however, we also explained in *Spain* that counsel cannot attempt to bolster the credibility of a witness by using facts not in evidence or by asserting that the witness should be believed simply because the witness is a police officer. 386 Md. at 156–58, 872 A.2d at 31–32. The prosecutor's statements in the present case ran afoul of both these prohibitions. The prosecutor argued in her rebuttal that Detectives Taylor and Rice might lose their jobs if they lied during their testimony, but there was no evidence at trial supporting that argument. The prosecutor also argued that the jury should find Taylor and Rice credible because, as police officers, they would be unlikely to lie. Like the prosecutor's statements in *Spain,* these statements in the instant case were improper.

The State contends that even if the prosecutor's statements were improper, the trial court's ruling was proper because of the "opened door" doctrine. We disagree. We explained in *Mitchell* that "the 'opened door' doctrine is based on principles of fairness and permits a party to introduce evidence that otherwise might not be admissible in order to respond to certain evidence put forth by opposing counsel." 408 Md. at 388, 969 A.2d at 1001 (citing *Conyers v. State,* 345 Md. 525, 545, 693 A.2d 781, 790 (1997)). In *Mitchell,* the defense attorney noted during closing arguments that the State had not presented the testimony of a number of people

who had apparently witnessed the crime at issue. 408 Md. at 388–89, 969 A.2d at 1001–02. In response, the prosecutor asserted that the defendant could have brought those witnesses into court with his subpoena power. *Mitchell*, 408 Md. at 389, 969 A.2d at 1002. We concluded that the opened door doctrine applied to the prosecutor's statements. *Mitchell*, 408 Md. at 389, 969 A.2d at 1002. We explained, however, that the opened door doctrine is "a narrow one," and we focused on the fact that "[t]he prosecutor's remarks ... were a tailored response to" the defense attorney's statements. *Mitchell*, 408 Md. at 389, 969 A.2d at 1002.

■■■ The prosecutor's improper statements in the present case were not "a tailored response to defense counsel's assertion" and, accordingly, do not fit within the "narrow" opened door doctrine. Defense counsel argued during his closing statement that Detective Taylor had testified that, "we can't take a picture of someone who is trying to sell drugs out on the street. That would be too much. We don't want to videotape them either because our word is good enough." Defense counsel further argued that Taylor's testimony was, "because I say it's so, that's good enough" and, "[y]ou need to believe us. You don't need anything to support [our testimony]. Just believe what I say because I'm a police officer." The prosecutor was certainly entitled to respond to these arguments in her rebuttal argument, which she did. She first argued that the defense attorney had mischaracterized Taylor's testimony, saying "[n]o, that's not what [Taylor] said." This argument was entirely appropriate. She next responded by arguing her own interpretation of what Taylor had said. The first part of this argument was also appropriate: "[Taylor] said, I stood up here and I said it's the truth, the whole truth, and nothing but the truth."[4] But the prosecutor's subsequent arguments—about the officer's incentive to tell the

---

4. The prosecutor also could have referred to evidence from the trial that supported Detective Taylor's testimony or provided some reasons why there were no photographs to support Taylor's testimony. Statements of that type would have been appropriate.

truth because of his status as a police officer—went well beyond what was necessary for an adequate response. The opened door doctrine therefore did not save them.[5]

## B.

### Convicting Petitioner to Combat the Drug Problem

 Petitioner also argues that the prosecutor "implicitly urged the jurors to convict . . . [Petitioner] in order to address the drug problem." Specifically, Petitioner takes issue with the prosecutor's statements that "drug dealers are the root of all evil" and that Petitioner is "the problem."[6] Based on these statements, Petitioner argues that the prosecutor was "effectively suggesting to the jury that it should convict [Petitioner] in order to prevent drug abuse." We

---

5. The Petitioner also argued in his brief, preemptively, that the "invited response doctrine" does not save the prosecutor's arguments. The invited response doctrine "suggests that 'where a prosecutorial argument has been made in reasonable response to improper attacks by defense counsel, the unfair prejudice flowing from the two arguments may balance each other out, thus obviating the need for a new trial.' " Lee v. State, 405 Md. 148, 168, 950 A.2d 125, 137 (2008) (quoting Spain v. State, 386 Md. 145, 157, n. 7, 872 A.2d 25, 32 n. 7 (2005)). The State chose not to assert the invited response doctrine, "acknowledg[ing], in light of Lee and Mitchell, that the invited response doctrine is inapplicable here."

6. The State argues, and the Court of Special Appeals held, that the prosecutor's statement that Petitioner is "the problem" was not preserved for appellate review because defense counsel only objected to the statement that "drug dealers are the root of all evil." We disagree. Defense counsel was not required to make a second objection when the court, not seconds before, had overruled his first objection to remarks of substantially similar character. See Lawson v. State, 389 Md. 570, 604, 886 A.2d 876, 881 (2005) (considering the propriety of remarks made during the prosecutor's closing statement, without a specific objection to those remarks, when the court had just overruled an objection to substantially similar remarks). By objecting when the prosecutor began her "root of all evil" argument, defense counsel "ma[de] known to the court the action that [Petitioner] desire[d] the court to take," Maryland Rule 4–323(c), and this objection demonstrated on "the record" that the issue was "raised in or decided by the trial court," Md. Rule 8–131(a).

agree with Petitioner that the prosecutor's statements were improper.

In *Hill*, we stated that "appeals to jurors to convict a defendant in order to preserve the safety or quality of the communities are improper and prejudicial." 355 Md. at 225, 734 A.2d at 209. We then noted with approval that the Court of Special Appeals had "declared improper a prosecutor's statement to the jury that 'by your vote you can say no to drug dealers, to people who rain destruction.' " *Hill*, 355 Md. at 225, 734 A.2d at 209 (quoting *Couser v. State*, 36 Md.App. 485, 374 A.2d 399 (1977)); *see also Holmes v. State*, 119 Md.App. 518, 705 A.2d 118 (1998) (concluding that the prosecutor improperly "implore[d] the jurors to consider their own interests and therefore violate the prohibition against the 'golden rule' argument"). We further noted that "[c]ourts throughout the country have condemned arguments of that kind, which are unfairly prejudicial and risk diverting the focus of the jury away from its sole proper function of judging the defendant on the evidence presented." *Hill*, 355 Md. at 225, 734 A.2d at 209.

The prosecutor's statements that Detective Taylor had called drug dealers "the root of all evil" and that Petitioner is "the problem" are precisely the type of statements that we forbade in *Hill*. The prosecutor's "root of all evil" statement alone may not have been improper, as she was commenting on Detective Taylor's testimony that "[t]he person selling drugs is the person that's the root of the evil." [7] The prosecutor's subsequent statements, however, undoubtedly crossed the line. She then stated that "[i]f there wasn't any drug dealers, they wouldn't be selling the drugs, and the buyers wouldn't need

---

7. The Court of Special Appeals stated that "it is significant that, at trial, [Petitioner] did not object" when Detective Taylor testified that drug dealers are "the root of the evil." We do consider this significant. Detective Taylor was not suggesting that Petitioner should be convicted because Petitioner is "the root of the evil." Taylor was explaining why he did not attempt to arrest the individuals who were allegedly buying drugs from Petitioner, in response to questions suggesting that there may not have been any such individuals. There was no reason for defense counsel to object to that entirely proper testimony.

the help" and that "the problem today is seated over there." These additional statements show that the prosecutor, by referring to drug dealers as "the root of all evil" and identifying Petitioner as a drug dealer, was specifically referring to Petitioner as "the root of all evil." In doing so, the prosecutor effectively asked the jury to combat two particular evils—drug dealing and drug use—and identified Petitioner as "the problem" that caused those evils.

The inescapable inference from the prosecutor's argument was that the jury could combat drug dealing and drug use generally by convicting Petitioner. Indeed, we can see no other purpose for the prosecutor's line of argument. Petitioner was not, however, on trial for committing or contributing to drug dealing and drug use generally; he was on trial for allegedly committing the drug possession and drug sale offenses that the State charged against him. Arguing that the jury should convict Petitioner to combat drug dealing and drug use generally was therefore improper.

## C.

### Harmless Error Analysis

 We have determined that the prosecutor's remarks were improper, but that does not end our inquiry. A reviewing court will not reverse a conviction due to a prosecutor's improper comment or comments "unless there has been an *abuse of discretion* by the trial judge of a character likely to have injured the complaining party.' " *Henry,* 324 Md. at 231, 596 A.2d at 1038 (quoting *Wilhelm v. State,* 272 Md. 404, 413, 326 A.2d 707, 714–15 (1974)). We must determine, upon our "own independent review of the record," whether we are "able to declare a belief, beyond a reasonable doubt, that the error in no way influenced the verdict." *Lee,* 405 Md. at 164, 950 A.2d at 134 (quoting *Dorsey v. State,* 276 Md. 638, 659, 350 A.2d 665, 678 (1976)). A prosecutor's improper comments influenced the verdict, and therefore require reversal, if it "appears that the ... remarks actually misled the jury or were likely to have misled or influenced the jury to the

defendant's prejudice. . . ." *Hill,* 355 Md. at 224, 734 A.2d at 209.

 To determine whether improper comments influenced the verdict, we look to the facts of the case at hand. *Lee,* 405 Md. at 164–65, 950 A.2d at 134; *Smith and Mack v. State,* 388 Md. 468, 488, 880 A.2d 288, 299–300 (2005); *Degren,* 352 Md. at 430, 722 A.2d at 902. In particular, we consider " 'the severity of the remarks, the measures taken to cure any potential prejudice, and the weight of the evidence against the accused.' " *Lee,* 405 Md. at 165, 950 A.2d at 134 (quoting *Lawson v. State,* 389 Md. 570, 592, 886 A.2d 876, 889 (2005)). Instead of considering each improper statement independently, as the Court of Special Appeals did in this case,[8] we look at "the cumulative effect of all errors on the ability of a jury to render a fair and impartial verdict in the context of the case." *Lawson,* 389 Md. at 604–05, 886 A.2d at 896.

 We first look at the severity of the prosecutor's remarks. Citing *Spain,* the State argues that the prosecutor's statements were " 'isolated events' made in the course of discussing the evidence and responding to defense counsel's closing arguments." We disagree. The improper "root of all evil" argument was an important part of otherwise brief closing arguments.[9] In addition to the "root of all evil" argument, the prosecutor's closing arguments consisted of only a description of the events surrounding Petitioner's arrest, a description of the police chemist's findings, and an

---

**8.** The Court of Special Appeals noted the Petitioner's argument that the prosecutor's remarks, "when either viewed in isolation *or cumulatively,* deprived him of a fair trial." *Donaldson v. State,* No. 1739 (Md.Ct. Spec.App. filed May 20, 2009) (emphasis added). The intermediate appellate court did not, however, address the cumulative effect of the improper statements, but instead looked only at each statement in isolation.

**9.** As she began her closing statement, the prosecutor signaled its brevity. She began, "Good afternoon, ladies and gentlemen of the jury. It's not too long to go. As you see, this case is not a very complex case. It's pretty straightforward." She did the same when she began her rebuttal argument, stating, "I won't take your time too much longer."

explanation of Detective Taylor's probable cause statement. In the context of an otherwise straightforward summation that primarily recounted the facts of the case, the argument that the jury should convict Petitioner to combat the drug problem could have had a significant impact.[10] The improper vouching comments were similarly prominent in the prosecutor's rebuttal argument. The entire rebuttal argument addressed the credibility of Detectives Taylor and Rice, and the prosecutor began that argument by improperly vouching for the detectives' credibility. These improper remarks, which related to everything else that the prosecutor discussed in her rebuttal argument, could very well have influenced the jury's perception of the entire argument. In our view, the prosecutor's improper remarks were severe.

The State primarily cites *Spain* for its argument that the improper remarks in the present case were not severe. In *Spain*, we concluded that the prosecutor had improperly vouched for a police officer's credibility, but we did not reverse the jury's guilty verdict. 386 Md. at 159–61, 872 A.2d at 33–35. There are, however, significant differences between *Spain* and the present case. Most notably, *Spain* involved only a single instance of improper vouching. 386 Md. at 159, 872 A.2d at 33. We concluded that this was "an isolated event that did not pervade the entire trial." *Spain*, 386 Md. at 159, 872 A.2d at 33. We cannot say the same for the present case, where the prosecutor made two separate sets of improper remarks that played an important role in both the closing and rebuttal arguments. Furthermore, the trial court in *Spain* gave a contemporaneous instruction to the jury when the single improper vouching occurred. 386 Md. at 159, 872 A.2d at 33. In contrast, the trial court in the present case gave no contemporaneous instructions for either the "root of all evil" argument or the improper vouching. If anything, the differ-

---

**10.** As an empirical matter, the "root of all evil" argument comprised a fair amount of the prosecutor's closing arguments. In the trial transcript, these statements counted for 10 lines out of the prosecutor's 75–line argument.

ences between *Spain* and the case before us highlight the severity of the improper statements in this case.

Next, we look at the measures taken to cure any potential prejudice. We have explained that jury instructions are "sufficiently curative" if the trial judge "instruct[s] contemporaneously and specifically to address the issue such that the jury understands that the remarks are improper and are not evidence to be considered in reaching a verdict." *Lee*, 405 Md. at 177–78, 950 A.2d at 142. As noted above, the trial court gave the jury no contemporaneous instructions, curative, specific, or otherwise. To compensate for the lack of contemporaneous instructions, the State points to the instructions given to the jury before closing arguments began, which told the jury to "base [its] findings only on the testimony of the witnesses, the exhibits which have been received into evidence, any stipulations, . . . and any conclusions which may be fairly drawn from that evidence." [11] We have recognized that such general jury instructions have a curative effect, as "Maryland courts long have subscribed to the presumption that juries are able to follow the instructions given to them by the trial judge, particularly where the record reveals no overt act on the jury's part to the contrary." *Spain*, 386 Md. at 160, 872 A.2d at 34. We have also noted, however, the limited curative effect of general jury instructions, given before closing arguments, because they cannot "address objectionable remarks" that have "not yet been made." *Lawson*, 389 Md. at 601–02, 886 A.2d at 894–95 (distinguishing *Spain* ). As in *Lawson*, the lack of contemporaneous instructions in the present case suggests that the improper statements were prejudicial, even

---

11. The jury instructions in the present case also included the following: The opening statements and the closing arguments of the lawyers are not evidence. If your memory or any of the testimony is different from anything that I might say, or anything that the lawyers might say, then you must rely upon your own memories of that evidence. Additionally, the trial judge instructed the jurors that they "must decide this case fairly and impartially" and that they "are the sole judges of whether a witness should be believed."

if the general jury instructions may have cured some of that prejudice.

Finally, we look to the weight of the evidence against Petitioner. The State argues, again citing *Spain*, that "the evidence against [Petitioner] was clear and uncontradicted, thus ensuring that any supposed errors did not 'substantially sway' the judgment of conviction." We are not persuaded by this argument. The primary evidence against Petitioner was testimony by Detectives Taylor and Rice, describing what they had seen, what occurred during Petitioner's arrest, and what they had taken from Petitioner during the arrest. This testimony, if accurate, is indeed unfavorable for Petitioner. The accuracy of the testimony was, however, a hotly contested issue at trial. Petitioner's entire defense centered on the detectives' credibility and the accuracy of their testimony. In particular, defense counsel raised questions about the detectives' claims that they saw Petitioner selling drugs to a group of individuals, even though the detectives did not arrest any other individuals and did not take any pictures or video of the sale. This defense was apparently effective to some extent, as the prosecutor dedicated her entire rebuttal argument to bolstering the detectives' credibility, partly with improper vouching. Considering that the majority of the evidence against Petitioner was strongly disputed at trial, we cannot conclude that the evidence against Petitioner was so overwhelming that the prosecutor's improper statements could not have influenced the jury's verdict.

On balance, each of the factors from our harmless error analysis suggests that the prosecutor's improper statements in this case may have influenced the jury's verdict. The improper statements played an important part in the prosecutor's closing and rebuttal arguments, the trial court gave no contemporaneous, curative instructions, and the evidence against Petitioner was not so strong that the improper statements could not have influenced the verdict. We therefore are not persuaded beyond a reasonable doubt that the prosecutor's

improper statements failed to influence the jury's verdict. To correct the error, Petitioner deserves a new trial.

**JUDGMENT OF THE COURT OF SPECIAL APPEALS REVERSED. CASE REMANDED TO THAT COURT WITH DIRECTIONS TO REMAND THE CASE TO THE CIRCUIT COURT FOR BALTIMORE CITY FOR A NEW TRIAL. BALTIMORE CITY TO PAY THE COSTS IN THIS COURT AND THE COURT OF SPECIAL APPEALS.**

MURPHY, J., concurs and dissents.

MURPHY, J., concurring and dissenting.

I agree with the majority "that there was probable cause to arrest Petitioner." I dissent, however, from the holding that Petitioner is entitled to a new trial because of the "improper" comments made by the prosecutor during the State's closing and rebuttal arguments.

According to the majority, Petitioner is entitled to a new trial because (1) during the State's closing argument, "the prosecutor stated that drug dealers are 'the root of all evil' and that Petitioner was 'the problem[,]' " and (2) during the State's rebuttal argument, "the prosecutor argued that the jury should believe the police officers who testified against Petitioner because '[t]hey want to keep their job' and because 'what gets them to keep their job' is 'their credibility and their integrity.' "

In *Rheubottom v. State,* 99 Md.App. 335, 637 A.2d 501 (1994), while citing several opinions of this Court, the Court of Special Appeals stated:

> It is, of course, true that just because a prosecutor makes an improper jury argument this does not necessarily "constitute reversible error." *Wilhelm [v. State ],* 272 Md. [404] at 431, 326 A.2d 707 [at 724 (1974) ] ... In *Wilhelm,* Judge O'Donnell stated:
>
> > There are no hard-and-fast limitations within which the argument of earnest counsel must be confined—no well-

defined bounds beyond which the eloquence of an advocate shall not soar.

*Id.* at 413, 326 A.2d [at 714]. While we do not disagree with that proposition, surely there are also depths into which the unfair argument of a too zealous advocate cannot be permitted to sink.

The rule is that reversal is warranted if "it appears that the jury were actually misled or were likely to have been misled or influenced to the prejudice of the accused." *Wood v. State,* 192 Md. 643, 652, 65 A.2d 316[, 320] (1949); *see also Shoemaker v. State,* 228 Md. 462, 473–74, 180 A.2d 682[, 688] (1962); *Kellum v. State,* 223 Md. 80, 88, 162 A.2d 473[, 478] (1960) (quoting *Wood, supra* ).

*Id.* at 341–42, 637 A.2d at 504.

As to the statements made during the State's closing argument, the record shows that during his cross-examination, Detective Taylor did express the opinion that drug dealers are the root of all evil. Although it was improper for the prosecutor to characterize Petitioner as *"the problem,"* I am persuaded beyond a reasonable doubt that this comment was not likely to influence the jury "to the prejudice of the accused."

As to the "improper vouching" comments made during the State's rebuttal argument, I find it impossible to hypothesize a single juror who would have (1) convicted Petitioner on the basis of these isolated comments about a police officer's motivation to testify truthfully, but (2) acquitted Petitioner if reminded by the Circuit Court, immediately after Petitioner's trial counsel had objected to the "they want to keep their job" argument, that "arguments of counsel are not evidence." Moreover, as this Court noted over 100 years ago:

In the case of *Dunlop v. The United States,* 165 U.S. 486 [17 S.Ct. 375, 41 L.Ed. 799 (1897)], the [United States Supreme] Court said: "If every remark made by counsel outside of the testimony were ground for a reversal, comparatively few verdicts would stand, since in the ardor of advocacy, and in the excitement of trial, even the most

experienced counsel are occasionally carried a way by this temptation."

*Toomer v. State,* 112 Md. 285, 293, 76 A. 118, 122 (1910).

It is presumed that the jurors who convicted Petitioner (1) responded truthfully when *voir dired* during the jury selection process, and (2) during deliberations, followed the instructions they received from the Circuit Court. We should therefore presume that the jury (1) did not give greater weight to Detective Taylor's testimony on the ground that he is a member of the Baltimore City Police Department, and (2) decided the case based upon the evidence presented rather than upon statements made during closing arguments. Applying these presumptions to the record of the case at bar, I am persuaded that the improper comments at issue neither misled the jury nor influenced the jury's verdict. I would therefore affirm the judgment of the Circuit Court.