STATE, *ex rel.* DAN HARDIE v. D. C. COLEMAN.

155 So. 129.
Opinion Filed May 26, 1934.

120

E. F. P. Brigham and Stafford Caldwell, for Relator; James M. Carson, Ben C. Willard and A. C. Dressler, for Respondent.

TERRELL, J.—In November, 1932, the relator, Dan Hardie, was elected sheriff of Dade County. He was commissioned and assumed the duties of said office in January, 1933. In October of the same year, by four consecutive orders of the Governor he was suspended from office under Section 15 of Article IV of the Constitution, and the respondent, D. C. Coleman, was appointed in his stead.

Executive order No. 1 was predicated on "neglect of duty in office" and "incompetency," in that Anne M. Corbet, a woman of high character, went to the office of Dan Hardie, in February or March, 1933, to protest against the inhuman, unmanly and cruel manner in which his deputies had made an arrest of Gilbert Jones, but that the said sheriff refused to listen to the protests of the said Anne M. Corbet or to make an investigation of the facts, he further became abusive and insulting to her and permitted one of the deputies, Paulson by name, to insult her, and he instructed Paulson in her presence to see that Gilbert Jones went to the chain gang.

Executive order No. 2 was predicated on "malfeasance" and "misfeasance," in that the said Dan Hardie did in March, 1933, have delivered to him at his home for personal use many items of food purchased for the consumption of the prisoners in the Dade County jail.

Executive order No. 3 was predicated on "neglect of duty in office" and "incompetency" in that during the month of April, 1933, three ladies called on the said Dan Hardie at his office for the purpose of advising him of facts in connection with the beating to death of an old man by masked men, in the City of Miami, but the said sheriff refused to listen to such facts as proposed to be disclosed to him and he acted in such a discourteous and vulgar manner that the said ladies were forced to leave his presence without re-

vealing their mission which it was his duty to hear and investigate.

Executive order No. 3 also sets up that in the month of July, 1933, on another occasion, three ladies called on Dan Hardie to discuss a certain kidnapping just outside the corporate limits of the City of Miami, but that on this occasion he exhibited such lack of sound judgment and mental stability that he persisted in exhibiting to them different guns and weapons which he was prepared to use in defending himself from imaginary attacks by gangsters, and his entire conduct was such that he was far from being a man of sound judgment and mental stability.

Executive order No. 4 was predicated on "malfeasance," "misfeasance," "neglect of duty in office" and "incompetency," in that Dan Hardie did prior to March 23, 1933, actively enter into and participate in the making of plans to throw dynamite upon a certain building in the City of Miami, and did aid, counsel and advise one Warren D. Fletcher in making said plans and did plan with the said Warren D. Fletcher to kill one, L. W. Rogers and Emory Burton, they having been induced by Fletcher to go forward with the plans for dynamiting said building.

Executive order No. 4 also alleges that Dan Hardie was fully advised and cognizant of a conspiracy between the said Fletcher, Rogers and Burton to commit the crime as heretofore charged in Executive order No. 4, but that he failed and neglected to arrest the said Fletcher, Rogers and Burton, for the said crime as it was his duty to do.

On November 7th, the Governor accorded Dan Hardie a hearing on his application for reinstatement, at which time much testimony was taken concerning the charges against him, as defined in the four executive orders. December 7th, the Governor wrote Dan Hardie a letter ad-

vising him that he had found the charges for which he was suspended to be true, that he failed to produce evidence to dispute them and that his application for reinstatement was denied.

Information in .the nature of quo warranto was then filed in this cause. D. C. Coleman, the sheriff appointed to succeed Dan .Hardie, was named respondent ·and a writ of quo warranto was issued, directed to him without prejudice to the determination hereafter of any jurisdictional question which may be involved affecting the character, scope and extent of· the jurisdiction to be exercised. A demurrer and motion to quash the information were entered and the cause now comes on for disposition on that demurrer and motion.

We are first confronted with the question of whether or not this Court will, on quo warranto, review the act of the Governor in suspending Sheriff Hardie by virtue of the power vested in him under Section 15 of Article IV of the Constitution.

Section 15 of Article IV is as follows: ·

"All officers that shall have been appointed or elected, and that are not liable to impeachment, may be suspended from office by the Governor for malfeasance or misfeasance or neglect of duty in office, for the commission of any felony, or for drunkenness or .incompetency, and the cause of suspension shall be communicated to the officer suspended and ·to the Senate at its next session. And the Governor, by and with the consent of the Senate, may remove any officer, not liable to impeachment, for any cause above named. Every suspension shall continue until the adjournment of the next session of the Senate, unless the officer suspended shall, upon recommendation of the Governor, be removed; but the Governor may reinstate the officer sus-

pended upon satisfactory evidence that the charge or charges against him are untrue. If the Senate shall refuse to remove, or fail to take action before its adjournment, the officer suspended shall resume the duties of the office. The Governor shall have power to fill by appointment any office, the incumbent of which has been suspended. No officer suspended who shall under this Section resume the duties of his office, shall suffer any loss of salary or other compensation in consequence of such suspension. The suspension or removal herein authorized shall not relieve the officer from indictment for any misdemeanor in office."

. Under this provision of the Constitution, the Governor may suspend any officer not liable to impeachment, for malfeasance, misfeasance, neglect of duty in office, commission of any felony, drunkenness or incompetency, and for no other causes.

Malfeasance has reference to evil conduct or an illegal deed, the doing of that which one ought not to do, the performance of an act by an officer in his official capacity that is wholly illegal and wrongful, which he has no right to perform or which he has contracted not to do. "Words and Phrases, Webster's New International Dictionary."

Misfeasance is sometimes loosely applied in the sense of malfeasance. Appropriately used, misfeasance has reference to the performance by an officer in his official capacity, of a legal act in an improper or illegal manner, while malfeasance is the doing of an official act in an unlawful manner. Misfeasance is literally a misdeed or a trespass, while nonfeasance has reference to the neglect or refusal without sufficient excuse to do that which was an officer's legal duty to do.

Neglect of duty has reference to the neglect or failure on the part of a public officer to do and perform some duty

or duties laid on him as such by virtue of his office or which is required of him by law. It is not material whether the neglect be willful, through malice, ignorance or oversight, when such neglect is grave and the frequency of it is such as to endanger or threaten the public welfare, it is gross. Attorney General v. Jochiam, 99 Mich. 358, 58 N. W. 611, 23 L. R. A. 699.

The commission of a felony as ground for removal from office has reference to a felony as distinguished from a misdemeanor under our statute and as such, comprehends any crime punishable by death or imprisonment in the State prison. Section 5006, Revised General Statute of 1920, Section 7105, Compiled General Laws of 1927. Suspension and removal for the commission of a felony is not predicated on the current use of that term.

Drunkenness as ground for suspension and removal, has reference to such use of spiritous, vinous or malt liquors as impairs or incapacitates an officer in the efficient discharge of his official duties. The impairment or incapacity may be slight, temporary or permanent. It has been said to be a self-imposed disability and in consequence is not to be regarded with that kindness and indulgence which we concede to blindness, deafness or any other physical infirmity.

Incompetency as a ground for suspension and removal has reference to any physical, moral or intellectual quality, the lack of which incapacitate one to perform the duties of his office. Incompetency may arise from gross ignorance of official duties or gross carelessness in the discharge of them. It may also arise from lack of judgment and discretion or from a serious physical or mental defect not present at the time of election, though we do not imply that all physical

and mental defects so arising would give ground for suspension.

In State v. Joughin, 103 Fla. 877, 138 So. 392, this Court held that the power vested in the Governor to suspend an officer under Section 15 of Article IV of the Constitution, is executive. Owens v. Bond, 83 Fla. 495, 91 So. 686. It is in no sense judicial or *quasi* judicial. It involves judgment and discretion on the part of the Governor, including the power to hear and decide; and the rule seems well settled that so long as the Governor acts within his jurisdiction as charted by organic law, his action may not be reviewed by the Courts. State, *ex rel.* Holland v. Ledwith, 14 Fla. 220, State, *ex rel.* Attorney General v. Johnson, 30 Fla. 433, 11 So. 845; State, *ex rel.* Attorney General v. Johnson, 30 Fla. 499, 11 So. 855; People, *ex rel.* Johnson v. Coffey, 237 Mich. 591, 213 N. W. 460, 52 A. L. R. 1, *In re* Garden, 171 N. Y. 529, 64 N. E. 451, 12 R. C. L. 1008. This general rule, however, is modified by the exception that such exercise of power being that affecting the lawful rights of individuals, the jurisdictional facts, in other words, the matters and things on which the Executive grounds his cause of removal may be inquired into by the Courts. State, *ex rel.* Bridges v. Henry, 60 Fla. 246, 53 So. 742.

Where does the power of this Court to inquire into the "jurisdictional facts," "matters and things" on which the Executive grounds his cause of removal end? This is the point of cleavage between relator and respondent here. Respondent contends that so long as the Governor suspends an officer for grounds stated in Section 15 of Article IV of the Constitution, the courts do not have jurisdiction to enquire into the causes for such suspension, while relator contends that we may not only enquire into the sufficiency of the jurisdictional facts alleged in the order of suspen-

sion but that we may go further and determine whether or not the evidence on which the Executive acted is sufficient to support the charges lodged against the suspended officer.

Section 15 of Article IV of the Constitution does not, neither do the statutes, indicate that form an Executive order of suspension thereunder should take, but we are of the view that if the order names one or more grounds embraced in the Constitution and clothes or supports it with alleged facts sufficient to constitute the grounds or cause of suspension, it is sufficient. A mere arbitrary or blank order of suspension without supporting allegations of fact, even though it named one or more of the constitutional grounds of suspension, would not meet the requirements of the Constitution. When we said in State v. Joughin, *supra,* that the courts were authorized to enquire into the jurisdictional facts on which the Governor's order of suspension was predicated, we meant to imply that the sufficiency of an executive order of suspension was ultimately a judicial question, because it affected the rights of individuals.

In the case at bar four separate orders of suspension were promulgated, the gist of each of which has been given in the forepart of this opinion. The first and third of said orders is grounded on "neglect of duty in office" and "incompetency." The second is grounded on "malfeasance" and "misfeasance" and the fourth is grounded on "malfeasance," "misfeasance," "neglect of duty in office" and "incompetency." In the promulgation of these orders of suspension, or any one of them, did the Govenror act within "his jurisdiction as chartered by organic law"? It is not necessary that all four executive orders meet the requirement of the Constitution. If any one or more of them do this, the Constitutional mandate is complied with. It is further not necessary that the allegation of fact contained in the ex-

ecutive order, as a basis of suspension, be as definite and specific as the allegations of an information or an indictment in a criminal prosecution. Being an executive order subject to review by the Senate, if, on the whole, it contains allegations that bear some reasonable relation to the charge made against the officer, it will be adjudged as sufficient. Tested by this criterion it is our conclusion that executive orders numbered 1, 3 and 4 are sufficient. We express no opinion as to executive order No. 2.

This brings us the pith of the difference between the position of the relator and respondent, viz.: Is this Court authorized to examine and determine the sufficiency of the evidence to support the charges preferred by the executive orders of suspension against the relator? A negative answer must be the response to this query.

In addition to prescribing the grounds of suspension and authorizing the Governor to suspend an officer when in his judgment one or more of such grounds exist, Section 15 of Article IV, provides that the cause of suspension shall be communicated to the officer suspended and to the Senate at its next session. It is further provided that the Governor by and with the consent of the Senate may remove any officer not subject to impeachment, for any of the causes of suspension, that every suspension shall continue until the adjournment of the next session of the Senate, unless the officer suspended shall, upon the recommendation of the Governor, be removed, but the Governor may reinstate the officer suspended upon satisfactory evidence that the charge or charges against him are untrue. If the Senate shall refuse to remove, or fail to take action before its adjournment, the officer suspended shall resume the duties of his office.

From this it will be seen that Section 15 of Article IV

of the Constitution provides a full, adequate and complete method for the suspension and removal of officers in this State. The Governor is vested with the power of suspension, while the officer suspended can only be removed by the approval of the Senate; that is to say, removals are accomplished by the joint action of the Governor and the Senate. If the Senate meets and refuses or fails to act on the suspension, the suspended officer at once resumes the duties of his office, or he may be reinstated by the Governor before the meeting of the Senate. The matter of reviewing the charges and the evidence to support them is solely in the discretion of the Senate; and in doing this, it may adopt such rules of procedure as it sees fit. Its judgment in this is final, and will not be reviewed by the Courts.

The power of suspension, being solely in the Governor, must be limited to the grounds stated in the Constitution. The Senate is nothing less than a Court provided to examine into and determine whether or not the Governor exercises the power of suspension in keeping with the constitutional mandate. No more solemn duty is imposed on the Governor and the Senate, and in the performance of that duty they should illuminate their course by the constitutional mandate and in its light protect society and be just to the officer suspended.

Much has been said by counsel on both sides about Myers v. United States, 272 U. S. 52, 71 L. Ed. 160. In that case the Supreme Court was confronted with a challenge to the constitutional validity of Section 6 of the Act of Congress of July 12th, 1876, providing that "Postmasters of the first, second and third classes shall be appointed and may be removed by and with the advice and consent of the Senate and shall hold their offices for four years unless sooner removed or suspended by law."

The Court held said Act unconstitutional, in so far as it attempted to make the President's power of removal depend on the consent of the Senate. This holding was grounded on that part of Article II of the Federal Constitution as follows:

"* * * he shall nominate, and by and with the advice and consent of the Senate, shall appoint ambassadors, other public Ministers and Consuls, Judges of the Supreme Court, and all other officers of the United States, whose appointments are not herein otherwise provided for, and which shall be established by law; but the Congress may by law vest the appointment of such inferior officers as they think proper, in the President alone, in the Courts of Law, or in the Heads of Departments."

That part of Section 1 of Article 2 providing that "The executive power shall be vested in a President of the United States of America," and the part of Section 3 of Article 2, providing that "He (the President), shall take care that the laws are faithfully executed" also aided the Court to its conclusion in the Myers case.

On the facts it appears that Myers was in July, 1917, appointed by the President with the advise and consent of the Senate, to be postmaster of the first class at Portland, Oregon, for a term of four years. In January, 1920, his resignation was demanded. He refused to comply and in February, 1920, he was removed by order of the Postmaster General, acting by direction of the President. Myers immediately petitioned the President and the Senate Committee on Post Offices, asking to be heard if any charges were filed. He protested to the Department against his removal. He pursued no other occupation and drew no other compensation during the interval. In April he brought suit in the Court of Claims for his salary from the date of his

removal to the end of his term. The Court of Claims adjudicated the cause against Myers because of laches in suing. The Supreme Court affirmed the judgment of the Court of Claims because the power of removal was incident to the power of appointment and solely in the discretion of the Executive under the Constitution.

Judge TAFT in preparing the opinion concurred in by a majority of the Court, reviewed at length the history of the provisions of the Federal Constitution affecting the power of the Executive and pointed out that under them the question of removal was exclusively an executive function. He also demonstrated that this was the opinion of the members of the Constitutional Convention, on which the courts generally, and every President from Washington to Coolidge had acted. Such was the ground for the opinion in the Myers case.

Except as it supports the prevailing political policy in this country of three separate and distinct departments of government, each independent of the other and all curbed by a system of checks and balances as defined in the Constitution, the Myers case has little or no influence on the case at bar. The decision in the Myers case, in other words, grew out of the fact that the power of removal under the Federal Constitution, was exclusively executive, and that Congress was without power to make it depend on the will or concurrence of the Senate. The case at bar is bottomed on Section 15 of Article 4 of the State Constitution which defines a complete scheme under which the power of removal is accomplished by making it a joint action on the part of the Governor and Senate.

Provision for removal first appeared in Section 19 of Article V of the Constitution of 1868, and as to some officers, was absolute in the Governor, but as to others, by the

Governor on consent of the Senate. The division of that responsibility between the Governor and the Senate appeared in Section 15 of Article 4 of the Constitution of 1885, though such distribution of power was evidently contemplated by the makers of every Constitution in the history of Florida. Article II, Constitution of 1838, 1861 and 1865, Article III, Constitution of 1868, and Article II, Constitution of 1885, all of which in effect provide that when expressly authorized persons belonging to one department may exercise powers appertaining to either of the other departments.

This blending of governmental powers or the authorization of persons in one department to exercise the power of another department was a distinct departure from the doctrine of the Federal Constitution on the separation of powers and is the basis for the distinction between the Myers case, *supra,* and the case at bar. The reason for the distinction is historical, not legal. The makers of the Federal Constitution had experienced the evils arising from one person exercising the functions of executive, legislature and judge. In their judgment this was one of the significant faults of the English system, and government in this country under the confederation had almost collapsed for that reason. For the purpose of guarding against the recurrence of this evil under the Federal Constitution, the three separate and distinct departments were created, the boundaries of each department was defined and safeguarded by a system of checks and balances. While this general rule of the separation of powers pervades the State Constitution, Section 15 of Article IV presents an exception to it, in that the power of removal must be exercised under State law by the Governor and the Senate. Sec. II, Const.

The power of the Governor to suspend and of the Governor and the Senate to remove is not an arbitrary one. Both are guarded by constitutional limitations which should be strictly followed. It has been charged that this is an unusual power to vest in the Governor and the Senate, and so it is, but the people have lodged it there. The position of Governor and Senator is one vested with great dignity and responsibility and we are not to presume that these places will be filled by the people with men who do not measure up to the responsibility imposed in them. At any rate the duty imposed should be exercised with great care and caution because, when done, the result is final, as no other power is authorized to interfere.

We therefore conclude that this Court is authorized to determine the sufficiency of the jurisdictional facts on which the Governor rests any suspension under Section 15 of Article IV of the Constitution, but we have no authority to determine the sufficiency of the evidence to support the grounds of such suspension, that being solely a function of the Senate under such rules as it may prescribe.

The demurrer to the information is accordingly sustained.

DAVIS, C. J., and WHITFIELD, ELLIS, BROWN and BUFORD, J. J., concur.

DAVIS, C. J. (concurring).—The holding of the Court in this case is that the Supreme Court of Florida has no power to judicially review and set aside an executive order of the Governor suspending an officer from the performance of his duties where the cause of suspension can be passed upon by the State Senate. Whether this is a correct rule to follow or not is beyond the competency of this Court to change at this time, in view of the fact that it has been declared and enforced here for many years. All that the courts can do is see to it that when the Governor *attempts*

to exercise the powers vested in him by Section 15 of Article IV of the Constitution, that he shall do so in the manner and in the form, and according to the prescribed procedure, ordained by the Constitution. The Courts have no authority to look to anything more than the record of the proceedings which the Governor himself has certified to and filed with the Secretary of State as his cause for suspension. If this is sound on its face as an executive order, the courts are powerless to set it aside because it may have been made pursuant to an abuse of executive power, or because it may have been made wrongfully and without sufficiently good causes in fact to warrant it. The lack of power in the courts is not because the Governor is above the law, nor because he is not amenable to judicial processes in order to test the legality of his acts. The lack of power in the courts to set aside the Governor's action in a suspension case is due entirely to the fact that the Constitution itself has set up its own special court to try the matter, namely, the State Senate. All that the courts can do in any case of this kind is simply to determine whether or not the Governor, on the face of his executive order, has "stated a case" sufficient to be considered by the Senate under Section 15 of Article IV of the Constitution of this State. Where the Governor has on the face of his executive order of suspension sufficiently "stated a case" to go to the State Senate for its consideration, if the Governor elects to base thereon a recommendation for permanent removal of the officer, the past holding of this Court has been that the ordinary processes of the courts are powerless to reach and interfere with the right of an appointed successor to the suspended officer to fill by the Governor's appointment the office during the interim. I, therefore, concur in the opinion and in the result as stated by Mr. Justice TERRELL.