56 A.3d 286

**Tyrone FRANCIS and Milton Smith**

v.

**STATE of Maryland.**

**Nos. 908 & 913, Sept. Term, 2011.**

Court of Special Appeals of Maryland.

Nov. 21, 2012.

2

4

6

Michael J. Belsky (Megan E. Olezewski, Schlachman, Belsky, & Weiner, PA, Kenneth W. Ravenell, Milin Chun, Murphy & Falcon, on the brief) Baltimore, MD, for appellant.

Cathleen C. Brockmeyer (Douglas F. Gansler, Atty. Gen., on the brief) Baltimore, MD, for appellee.

Panel: ZARNOCH, MATRICCIANI, CHARLES E. MOYLAN, JR. (Retired, Specially Assigned), JJ.

MATRICCIANI, J.

On May 4, 2010, the Grand Jury for Baltimore City indicted appellants, Baltimore City Police Officers Tyrone Francis and Milton Smith, on charges of kidnapping, false imprisonment, assault in the second degree, conspiracy, and misconduct in office. On April 19, 2011, the Circuit Court for Baltimore City commenced trial, and on May 2, 2011, the jury returned its verdict acquitting appellants of all crimes but misconduct. On June 1, 2011, the court sentenced each appellant to eighteen months of confinement, all suspended, and to eighteen months

of probation. On June 7, 2011, appellants noted their appeals, which were consolidated on March 26, 2012.

## QUESTIONS PRESENTED

Appellants present the following questions, which we have rephrased for clarity:

I. Did the circuit court err when it denied appellants' motions for mistrial on the grounds of improper and prejudicial remarks in the State's closing argument?

II. Did the circuit court err when it instructed the jury that the crime of misconduct in office includes "wrongful" acts?

III. Did the circuit court err when it denied appellant's motion for mistrial where the State failed to disclose certain inconsistent witness statements prior to trial?

IV. Did the circuit court err when it suspended a codefendant's trial and continued with appellants' defense and verdict?

For the reasons that follow, we answer no to each of these questions and affirm the judgments of the Circuit Court for Baltimore City.

## FACTUAL AND PROCEDURAL HISTORY

Appellants were detectives in the Baltimore City Police Department, assigned to the "Violent Crimes Impact Division."[1] On May 4, 2009, they were on patrol with a third detective, Gregory Hellen, in the area of the Gilmore Homes public housing development in west Baltimore. The detectives were wearing plain clothes and riding together in an unmarked blue van as an "overtime crime suppression detail"[2]

---

1. According to Francis's trial testimony, the Violent Crime Impact Division was a group of approximately three-hundred officers tasked with investigating violent crimes in notoriously dangerous parts of Baltimore City.

2. Francis testified that the federal government provides funds to supplement the City Police Department's budget and pay for overtime patrols that extend the department's regular activities.

when they encountered Shawnquin Woodland [3] and, after parting ways with him, encountered Michael Johnson, both of them fifteen-year-old area residents.

The details of these encounters are hotly contested, but it is undisputed that after driving around for some time with each of the young men, the detectives deposited Woodland in east Baltimore, approximately three miles from the Gilmore Homes, and deposited Johnson in Howard County, approximately ten miles west of the Gilmore Homes. Woodland walked the three miles back to his residence. In Howard County, Johnson called 911 from a gas station nearby, and at approximately 8:00 p.m., Officer Terrence Benn of the Howard County Police Department found Johnson where he had been left, wearing damp clothes without shoes or socks and appearing frightened.

Appellants were indicted on May 4, 2010, and charged with kidnapping, false imprisonment, assault in the second degree, conspiracy, and misconduct in office. They and Hellen moved to sever all charges and all co-defendants, but the circuit court denied their motion and ruled that the evidence in all cases and all counts was mutually admissible. Appellants elected to be tried by jury while Hellen chose a bench trial, and the joint proceedings commenced on April 19, 2011.

The State called Woodland to testify, and he provided the following version of the events of May 4, 2009. At approximately 5:00 p.m., Woodland was standing with his friend when the three detectives drove up and asked Woodland a question. When he did not respond and started laughing at his friend's joke, the detectives exited the vehicle, handcuffed him, and placed him in the van. Smith said that Woodland needed to "learn a lesson," and the detectives made threatening statements as they drove. Woodland answered no questions, but when the detectives dropped him off in east Baltimore, Smith said, "Thanks for the information." [4] Woodland spent forty-

---

3. Mr. Woodland is referred to as both "Shawn Quinn" and "Shawnquin."

4. The State maintained that this was said so that the people nearby would believe Woodland was cooperating with police.

five minutes walking home and, when he arrived, told Johnson and Myron Evans (Johnson's cousin) what had happened. The detectives were still there and approached the three young men, at which point Woodland walked away. Woodland saw the detectives leave, return, and confront Johnson, at which point Smith grabbed Johnson's shirt and forced him into the van.

Johnson also testified at trial and recounted the following facts. Francis was in the van when he called Johnson over and told him that Smith, seated in the back of the van, had something to say. When Johnson approached the van, Smith said that if Johnson "ever look[s] at him wrong or mug[s] him or something," Smith would sodomize him. Johnson walked away and mumbled something, then Smith exited the vehicle, grabbed Johnson by the shirt and hands, and forced him into the van, where he told him that "the area was going to learn some respect." Smith threw Johnson's phone battery out of the window and removed Johnson's shoes and socks before dropping him off in Howard County, where he called 911 twice and reported that he had been beaten and abandoned by the detectives.

Myron Evans, who had been with Woodland and Johnson earlier, and Cory Taylor, another young area resident, testified that the detectives returned to the Gilmore Homes development and threw Johnson's shoes and socks from the van. Taylor gave the shoes to Evans's sister, Shekia McCaskill, who testified that when she took them to Johnson's residence, he was on the steps of his house, visibly upset and without shoes.

On cross-examination, Woodland stated that he did not see the detectives throw Johnson's shoes and socks from the van when they returned to the Gilmore Homes. The defense confronted Woodland with a 2009 police report indicating that he *had* seen Johnson's socks and shoes thrown out, and asked whether he had told the State's attorneys the same thing. Woodland denied what was in the report, and he stated that he told both the police and the State's attorneys that he had

*not* seen Johnson's shoes thrown from the van. The defense moved for a mistrial on the grounds that the State had "an absolute obligation" to disclose Woodland's statements to the State's attorneys because they contradicted the police report of his statement in 2009. The court denied this motion, ruling that because the State had disclosed Woodland's police statement along with contradictory statements from *other* witnesses, it had satisfied its obligations under *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and Maryland Rule 4–263.[5]

When the defense cross-examined Johnson, he stated that he had called 911 twice from Howard County. He explained that in his first call, he told the operator that he had been "beaten up" by the police, but the dispatcher laughed and hung up, and Johnson had to call back and repeat himself. The second time, the dispatcher asked if Johnson had called a moment ago and eventually directed Officer Benn to Johnson's location.

Johnson said he had informed the police of these facts in 2009 and, more recently, had informed two State's attorneys. The defense moved for a mistrial, arguing that a 2009 police report and a 911 recording that the State disclosed in discovery did *not* indicate that Johnson made two calls or that the operator had laughed and hung up on him, and that the State therefore should have disclosed Johnson's contradictory statements made to the State's attorneys. The court noted that

---

**5.** Rule 4–263 provides, in relevant part:

> (d) *Disclosure by the State's Attorney.* Without the necessity of a request, the State's Attorney shall provide to the defense:
> (1) *Statements.* All written and all oral statements of the defendant and of any co-defendant that relate to the offense charged and all material and information, including documents and recordings, that relate to the acquisition of such statements;
> \* \* \*
> (6) *Impeachment information.* All material or information in any form, whether or not admissible, that tends to impeach a State's witness, including:
> (D) an oral statement of the witness, not otherwise memorialized, that is materially inconsistent with another statement made by the witness or with a statement made by another witness[.]

phone records in evidence showed that Johnson had, in fact, made two calls to 911. Continuing, the court held that Johnson's statements were not material to appellants' guilt, but that they were impeachment evidence that should have been disclosed under Rule 4–263(d)(6). The court denied appellants' motion for a ten-day continuance but granted them one day to investigate the issue.

After the State rested, appellants' co-defendant, Officer Hellen, moved for a continuance to accommodate his trial counsel's schedule. The court granted the continuance and suspended only Hellen's bench trial, while the court proceeded with appellants' jury trial and verdict.

Of the three detectives, only Officer Francis testified for the defense. He explained that he believed Woodland was either under arrest or providing information on criminal activity, and that Johnson was put in the van because he was providing similar information. Francis also testified that none of the detectives made the remarks that Woodland and Johnson alleged. Finally, Francis stated that he drove into Howard County because he missed an exit on the beltway, and that Smith told him to leave Johnson in the county because Johnson requested to be left there.

Appellants concluded their defense and the court charged the jury. Appellants objected to the court's proposed misconduct instruction on the grounds that the crime of malfeasance includes only "unlawful" acts.[6] The court denied appellants' objection and instructed the jury that the State had to prove that each appellant "corruptly did the unlawful *or wrongful* act" (emphasis added) of transporting each victim against his will to a location not of his choosing.

In closing, the State argued that the detectives' failure to follow proper police procedures was evidence that they were not conducting a legitimate investigation on the night in

---

6. When appellants earlier moved for a judgment of acquittal for insufficient evidence of misconduct, the State's attorney stated "that the only mode of misconduct in office that was charged was malfeasance."

question. The State recounted testimony from various police officials saying that officers cannot use a juvenile as an informant without parental permission. The State then called into question the defense's theory that if a juvenile is a "confidential source," an officer could take the juvenile to a remote location for questioning without parental permission. The State argued that a confidential source is someone who comes forward with information, and not "a person that you pick up off of the street and take wherever you want without their parent's permission." The State attempted to round out its argument with a rhetorical question: "Yet in their arrogance these Defendants suggest that because these kids live in—can you imagine this argument being made in Howard County or Baltimore County?" The court sustained the defense's objection to this comment, without explanation.

The State immediately launched into another rhetorical question and asked, "Do you think if there was any legitimacy to [the defendants'] taking these 15–year–olds and dropping them off miles from their homes that [the defendants] would have been suspended without even ..." Again, the defense interrupted with an objection and the court ordered the statement struck.

When the State concluded its argument, the defense moved for a mistrial and argued that the State's first rhetorical question was an appeal to racism and bias. The defense also argued that the State's second rhetorical question improperly suggested that the detectives' suspension from work was a determination of wrongdoing. The court denied the motion for mistrial, holding that the State's attorney was interrupted during its first question and thus "didn't even make" the argument that the defense attributed to her. The court also held that having struck the State's second question was a sufficient remedy and that it required no further action.

In closing argument, counsel for Smith argued to the jury members that the State was asking them "to act like [the defendants] just appeared one day on May 4th, 2009 as police officers and somehow became rogue cops, became rogue detec-

tives and stepped out of who[ ] they have been for so long to commit these crimes." Counsel for Francis similarly argued that the detectives were "good officers:"

> Never once have they had a complaint filed against them for kidnaping, assault, [or] false imprisonment[,] and the State wants you to believe that on May 4th, 2009, in the midst of executing a federal warrant against a very dangerous man, in the midst of doing their job, they decide we're just going to go and kidnap people.

The State took up this issue in its rebuttal and argued: "We are not saying . . . that all of [a] sudden their behavior just changes. We're saying this time they got caught." The defense objected,[7] but the court overruled the objection and the State continued: "This time they got caught. Because these two brave young men had the courage to come forward and tell us what happened."

The jury deliberated and returned its verdict acquitting appellants of all counts except misconduct. As previously indicated, the court sentenced each appellant on June 1, 2011 to eighteen months of confinement, all suspended, and to eighteen months of probation. Appellants then noted their appeals, which were consolidated for briefing and argument in this Court.[8]

### DISCUSSION

### I.

 Appellants argue that the circuit court erred when it denied their motions for mistrial on the grounds of improper

---

7. Appellants and the State agree that counsel for Francis objected, but they disagree vehemently over whether counsel for Smith *also* objected, going so far as to submit conflicting affidavits in this appeal. The State's appellate counsel swears that her review of the trial audiovisual recording shows no objection by Smith's counsel, while the Chief and Deputy Chief of Baltimore City Circuit Court Reporting Services swear that Smith's counsel *did* object. As will be seen, our holding prevents us from having to wade into this conflict.

8. Although Hellen's trial is not included in this appellate record, the court found him not guilty of all counts charged after appellants' jury trial had concluded.

and prejudicial remarks in the State's closing argument. As a general matter, counsel are afforded "great leeway" when presenting that portion of their case. *Donaldson v. State,* 416 Md. 467, 488, 7 A.3d 84 (2010).

[I]t is, as a general rule, within the range of legitimate argument for counsel to state and discuss the evidence and all reasonable and legitimate inferences which may be drawn from the facts in evidence; and such comment or argument is afforded a wide range. Counsel is free to use the testimony most favorable to his side of the argument to the jury, and the evidence may be examined, collated, sifted and treated in his own way. Moreover, if counsel does not make any statement of fact not fairly deducible from the evidence his argument is not improper, although the inferences discussed are illogical and erroneous. Generally, counsel has the right to make any comment or argument that is warranted by the evidence proved or inferences therefrom; the prosecuting attorney is as free to comment legitimately and to speak fully, although harshly, on the accused's action and conduct if the evidence supports his comments, as is accused's counsel to comment on the nature of the evidence and the character of witnesses which the [prosecution] produces.

*Wilhelm v. State,* 272 Md. 404, 412–13, 326 A.2d 707 (1974) (brackets in original), *quoted in Mitchell v. State,* 408 Md. 368, 380, 969 A.2d 989 (2009).

Despite this latitude, counsel may not comment upon facts not in evidence or appeal to the prejudices or passions of the jurors. *Id.* at 489, 7 A.3d 84. We will not reverse a conviction due to a ruling on a prosecutor's improper remarks unless there has been an abuse of discretion by the trial judge of a character likely to have injured the complaining party; this is so if it appears that the remarks actually misled the jury or were likely to have misled or influenced the jury to the defendant's prejudice. *Id.* at 496–97, 7 A.3d 84. We therefore consider whether each remark was independently proper, then take them together in light of the circumstances at trial to determine whether they justified a mistrial. *Id.* at 496–97, 7

A.3d 84. For the reasons that follow, we hold that while certain State comments were—or may have been—improper, they were not likely to have misled or influenced the jury to the defendant's prejudice.

### A. *Appellants' Prior Conduct*

■ Appellants first claim that the State improperly commented on facts not in evidence when the State's rebuttal argument insinuated that appellants had not been caught despite committing similar acts in the past. In response, the State argues that its rebuttal comments were an "invited response" to the defense's closing argument that appellants had no history of improper police conduct. *See Mitchell,* 408 Md. at 381–82, 969 A.2d 989 (explaining the rule of "invited response").

In our opinion, the State's argument was a fair comment on the evidence. The defense, in closing, urged the jury to recall that appellants have *no adverse disciplinary history* and, from that fact, infer that they had not *actually committed* any bad acts in the past. The State, in turn, asked the jury to consider that the dearth of evidence could *also* be explained by *imperfections* in the disciplinary process, and the State urged the jury to infer the opposite of appellant's suggested fact. Of course, neither side had any evidence of how "accurate" the disputed disciplinary process is, but to hold that these remarks were unfair would prevent an attorney from either critiquing or defending any disciplinary system without evidence of that system's accuracy. There are, of course, practical limits to such inquiries, and we cannot expect parties in every case to investigate these matters.[9] It would thus be folly to prohibit attorneys from remarking that all evidence leaves some uncertainty as to the ultimate fact to be proved or disproved (hence the universal legal burden of *"reasonable*

---

9. A further consequence of the rule we reject would be that any evidence of accuracy would *itself* have to be validated, and so on *ad infinitum.*

doubt").[10] We therefore hold that both the defense's inference and the State's inference were fair comments on the evidence—or lack thereof.[11]

### B. Geographical Comparisons

■■ Appellants next argue that the State's reference to Baltimore and Howard Counties was "calculated to unfairly prejudice the jury against the defendant" by appealing to the jurors' personal interests as residents of Baltimore City. Appellants rely on *Hill v. State*, 355 Md. 206, 225, 734 A.2d 199 (1999), which held that "appeals to jurors to convict a defendant in order to preserve the safety or quality of their communities are improper and prejudicial."

As we see it, there are two possible interpretations of the State's rhetorical question asking the jury to consider how appellants' actions would be perceived in Howard or Baltimore Counties as opposed to the City. First, the State may have meant that appellants were simply *mistaken* in believing that city residents are more likely to know information useful to police. But the more likely meaning—intended or not—is that regardless of whether interrogating the average city resident

---

**10.** California's pattern jury instructions wisely recognize that the *reasonable* doubt standard is necessary "because everything relating to human affairs is open to some *possible* or imaginary doubt." CALJIC 2.90 (emphasis added).

**11.** Assuming—without deciding—that the State's comments were *improper*, then the defense's comments *also* must have been improper, thus rendering the State's comments permissible as an "invited response." *See Mitchell*, 408 Md. at 381–82, 969 A.2d 989. As explained above, both sides wished to explain how the absence of charges related to the defendant's prior conduct, but neither side had evidence *of that relationship* and relied instead on untested inferences. Without any such evidence—or independent reason to credit one inference over the other—we have no reason to hold that one is a correct inference while the other is not; to do so would displace the jury as finders of fact. Thus, the fate of each inference was bound to the other. If we are mistaken in our holding, above, and the State's rebuttal argument was *improper*, then the defense's preceding argument must *also* have been improper. As such, the State's remarks would have been a permissible invited response that "righted the scales" after the defense had tipped them in its favor. *See id.*

**18**

is more fruitful than interrogating the average county resident, the two groups should be treated equally. Regardless of whether this was an appeal to class, race, or any other demographic division, it had no basis in the evidence and possibly appealed to the jury's interests as city residents; as such, it appears to have been an improper comment.[12]

### C. Appellants' Suspensions

Appellants next contend that the State commented on facts not in evidence when it referred to appellants' suspensions from work following the incidents in question. In our view, this was an improper remark on facts not in evidence, but we note that it did not *introduce* appellants' suspensions into the trial; that fact had arisen earlier from various witness' testimony.[13] On the other hand, there was no record evidence showing the *import* of their suspensions and whether they were at all *probative of misconduct,* which rendered the State's comments improper. Nonetheless, the State argues that any prejudice was cured when the court sustained appellants' objection and struck the comment from the record.

### D. Prejudice

Having considered the *propriety* of each statement, we now must determine whether, taken together, they *actually misled* the jury or were *likely to have misled or influenced* the jury to the defendants' prejudice. *Donaldson,* 416 Md. at 496–97, 7 A.3d 84. As explained, above, the State's

---

12. The State argues that its reference to Baltimore and Howard Counties was proper because "there was an extensive discussion as to whether [Johnson's 911 call] had been routed to Baltimore County." Although the State's closing argument was interrupted, it is clear that it had naught to do with Johnson's emergency call.

13. The State contends that its statement was mere rhetorical flourish meant to bolster the credibility of its witnesses by pointing out that their testimony was at least credible enough to warrant appellants' suspensions. But as in note 12, above, the trial transcript reveals that the State's closing argument concerned not its own witnesses' testimony, but rather the "legitimacy" of appellants' actions; the State's argument therefore rings hollow.

comments about appellants' prior conduct were not improper, or else they constituted a non-prejudicial "invited response." Thus, our only concern is with the State's rhetorical questions about geographical disparities and disciplinary proceedings.[14]

A reviewing court will not reverse a conviction due to a prosecutor's improper comment or comments unless there has been an abuse of discretion by the trial judge of a character likely to have injured the complaining party. We must determine, upon our own independent review of the record, whether we are able to declare a belief, beyond a reasonable doubt, that the error in no way influenced the verdict. A prosecutor's improper comments influenced the verdict, and therefore require reversal, if it appears that the remarks actually misled the jury or were likely to have misled or influenced the jury to the defendant's prejudice.

To determine whether improper comments influenced the verdict, we look to the facts of the case at hand. In particular, we consider the severity of the remarks, the measures taken to cure any potential prejudice, and the weight of the evidence against the accused. Instead of considering each improper statement independently, . . . we look at the cumulative effect of all errors on the ability of a jury to render a fair and impartial verdict in the context of the case.

*Id.* (internal citations, quotation marks, and footnote omitted).

 In *Hill*, 355 Md. at 226, 734 A.2d 199, the Court of Appeals added that the reviewing court must "take account of the persistency of the prosecutor's conduct—continuing to make these remarks time and again despite the court's rulings that the remarks were improper."

A court obviously commits no error when it sustains objections to impermissible comments or gives a proper curative instruction, if that is all that is requested. There is a risk,

---

14. Appellants also argued in their briefs that the State's description of Johnson and Woodland as "brave" was improper vouching, but conceded at argument that they lodged no objection to this comment at trial.

however, when the prosecutor persistently ignores those rulings and continues in an improper course of conduct, that the jury may come to regard the court's rulings as rote window dressing and thus pay less attention to them.

*Id.*

We first note that the State's comments were not persistent. The court immediately sustained the defense's objections to both improper comments, and it ordered that the second be struck from the record. The State did not undermine the trial court's instructions by returning to either issue. If the trial court had granted a mistrial it would have been for two clipped statements; but these remarks were not so severe as to have misled the jury.

Second, the State did not call on the jurors to act on their prejudices or personal interests as in *Hill.* Judge Wilner vividly described the State's actions in *Hill* that led the Court to reverse the defendant's conviction:

> The issue before us emanates, ultimately, from the insistence of the prosecutor, throughout the trial and over constant objection, on informing the jurors that they had a responsibility to keep their community safe from people like Hill. In a soup to nuts performance, the prosecutor, whether through inexperience or a more disturbing disdain for proper conduct, began his inappropriate remarks with the very first statement he made to the jury and did not end them until the very last statement he made, paying utterly no attention to the numerous objections that were sustained by the court.

355 Md. at 211–13, 734 A.2d 199. Here, the State referred to the jurors' community obliquely and abandoned the argument upon the court's instruction.

Third, we agree with the trial court's assessment that the State did not make its argument clear to the jury. The State's brief "performance" in this case lies closer to *Couser v. State,* 36 Md.App. 485, 501, 374 A.2d 399 (1977), *aff'd on other grounds,* 282 Md. 125, 383 A.2d 389 (1978), in which the prosecutor made a single improper statement: "Let me just

say this to you, by your vote you can say no to drug dealers, to people who rain destruction." We held in *Couser* that while the State's comment was improper, it was not likely to have misled the jury to the prejudice of the accused. *Id.* at 501–02, 374 A.2d 399.

Fourth, although in the present case the State made *two* questionable comments, their combination does not remove this case from the realm of *Couser* and move it into prejudice. In its remark on appellants' suspensions, the State posed a question that might occur to anyone who knew that appellants had been suspended. The jurors already knew just that, and thanks to the trial court's swift intervention, the State was unable to drive its point home.

Finally, although the "weight of the evidence" against appellants did not greatly outweigh their defense, we cannot ignore the fact that the sum of *all* the evidence far outweighed the two stunted inferences the State made in its closing remarks. *See Reeves v. State,* 807 So.2d 18, 44–45 (Ala.Crim.App.2000) ("A prosecutor's statement must be viewed in the context of all of the evidence presented and in the context of the complete closing arguments to the jury." (quoting *Roberts v. State,* 735 So.2d 1244, 1253 (Ala.Crim.App.1997), *aff'd,* 735 So.2d 1270 (Ala.1999))). The State's remarks did not result in the amount of prejudice held sufficient for reversal in past cases, and in light of the several days' worth of evidence presented to the jury and the court's swift action stopping the arguments before their completion, we conclude beyond a reasonable doubt that the State's closing arguments were not likely to have misled the jury or influenced its verdict against appellants.

## II.

Appellants next argue that the circuit court erred when it instructed the jury that a misconduct conviction in this case could rest on "wrongful" acts, rather than "unlawful" acts. Appellants were charged generally with "misconduct," which the Court of Appeals has explained comes in three

varieties: "(1) the doing of an act which is wrongful in itself—malfeasance, or, (2) the doing of an act otherwise lawful in a wrongful manner—misfeasance; or, (3) the omitting to do an act which is required by the duties of the office—nonfeasance." *Duncan v. State*, 282 Md. 385, 387, 384 A.2d 456 (1978) (citing *State v. Carter*, 200 Md. 255, 262–67, 89 A.2d 586 (1952); *Chester v. State*, 32 Md.App. 593, 601–10, 363 A.2d 605 (1976); R. Perkins, *Perkins on Criminal Law* 482–92 (2d ed.1969)).

Admittedly, it is difficult to discern any difference between misfeasance and malfeasance if both are satisfied by "wrongful" conduct; and according to our research, the majority of states restrict malfeasance to "unlawful" conduct, whereas misfeasance is "lawful" conduct done "wrongfully." [15] Appel-

---

**15.** The majority of states and recent case law holds that "malfeasance" excludes conduct that is merely "wrongful" and requires an "unlawful" act. *See Mazzola v. City and County of San Francisco*, 112 Cal.App.3d 141, 150, 169 Cal.Rptr. 127 (Cal.Ct.App.1980); *Coite v. Lynes*, 33 Conn. 109, 115 (Conn.1865); *Wallace v. State*, 58 Del. 521, 530–31, 211 A.2d 845 (Del.1965); *State ex rel. Hardie v. Coleman*, 115 Fla. 119, 125, 155 So. 129 (Fla.1934); *In re Impeachment of Bevins*, 28 Haw. 733, 741 (Haw.1925); *Walton v. Channel*, 34 Idaho 544, 556, 204 P. 661 (Idaho 1922); *Johnson v. Macon County Bd.*, 104 Ill.App.3d 885, 891, 60 Ill.Dec. 665, 433 N.E.2d 707 (Ill.App.Ct.1982); *State v. McRoberts*, 207 Ind. 293, 298, 192 N.E. 428 (Ind.1934); *People ex rel. Johnson v. Coffey*, 237 Mich. 591, 601, 213 N.W. 460 (Mich.1927); *In re Proposed Petition to Recall Governor Ventura*, 600 N.W.2d 714 (Minn.1999); *State v. Kilmer*, 194 Neb. 434, 435, 231 N.W.2d 708 (Neb.1975); *CAPS v. Board Members*, 113 N.M. 729, 730, 832 P.2d 790 (1992); *People ex rel. Seaman v. Cocks*, 149 A.D. 883, 886–87, 134 N.Y.S. 808 (N.Y.App.Div. 1912); *Reckman v. Keiter*, 109 Ohio App. 81, 92–93, 164 N.E.2d 448 (Ohio Ct.App.1959); *State v. Langley*, 214 Or. 445, 464, 323 P.2d 301 (Or.1958); *Mid–South Indoor Horse Racing, Inc. v. Tennessee State Racing Com.*, 798 S.W.2d 531, 538 (Tenn.Ct.App.1990); *Warren v. Commonwealth*, 136 Va. 573, 588, 118 S.E. 125 (Va.1923); and *In re Cathy Pearsall–Stipek*, 141 Wash.2d 756, 768, 10 P.3d 1034 (Wash. 2000).

There are, however, a number of states wherein "wrongful" conduct suffices for "malfeasance." *See Ariz. Indep. Redistricting Comm'n v. Brewer*, 229 Ariz. 347, 275 P.3d 1267, 1276 (2012); *Alabama Elec. Coop. v. Alabama Power Co.*, 283 Ala. 157, 161, 214 So.2d 851 (Ala. 1968); *White v. Lowry*, 162 Miss. 751, 758, 139 So. 874 (Miss.1932); *Lee v. Providence Wash. Ins. Co.*, 82 Mont. 264, 274–75, 266 P. 640 (Mont.1928); *State v. Hinds*, 143 N.J. 540, 545, 674 A.2d 161 (N.J.

lants stress that the Maryland Pattern Jury Instruction Committee was aware of *Duncan, supra,* and yet drafted the pattern instruction on malfeasance using *only* the word "unlawful" because the Committee recognized that as the distinction between malfeasance and misfeasance. *See* Maryland Criminal Pattern Jury Instructions 4:23.[16] Regardless of the Committee's obvious esteem, *Green v. State,* 127 Md.App. 758, 771, 736 A.2d 450 (1999) (the Committee is "a group of distinguished judges and lawyers who almost amount to a 'Who's Who' of the Maryland Bench and Bar"), it is the Court of Appeals who must decide whether the Committee's wisdom trumps the language it employed in *Duncan.* Under the definition of misconduct set forth in *Duncan,* the trial court's instructions were not improper and there was no error in denying appellants' objections to them.

Even if the Court of Appeals were to adopt the distinction that appellants urge, it appears that this would make no difference to appellants' case. As the Court of Appeals held in *State v. Carter* (coincidentally, a misconduct case cited in *Duncan* ), "the name of a crime given in an indictment does not determine the offense alleged to have been committed by the accused, but the offense is determined by the facts stated in the indictment." 200 Md. at 262, 89 A.2d 586 (citing *Cargile v. State,* 67 Ga.App. 610, 21 S.E.2d 326 (1942)), *cited with*

---

1996); *Lawhorn v. Robertson,* 1954 OK CR 19, 266 P.2d 1008 (Okla. Crim.App.1954); *State ex rel. Steffen v. Peterson,* 2000 SD 39, P20, 607 N.W.2d 262 (S.D.2000); and *Madsen v. Brown,* 701 P.2d 1086, 1094 (Utah 1985).

The remaining states make no distinction between malfeasance and misfeasance. *See People v. Schneider,* 133 Colo. 173, 178, 292 P.2d 982 (Colo.1956); *Commonwealth v. Wood,* 116 Ky. 748, 750, 76 S.W. 842 (Ky.1903); *State v. Petitto,* 59 So.3d 1245, 1248–49 (La.2011); *State v. Hinds,* 143 N.J. 540, 545–46, 674 A.2d 161 (N.J.1996); and *Commonwealth v. Dolny,* 235 Pa.Super. 241, 247, 342 A.2d 399 (Pa.Super.Ct.1975).

**16.** Model Instruction 4:23 uses the terms "malfeasance," "misfeasance," and "nonfeasance" only in its caption and not in the text of the pattern instruction, itself. The instruction allows the choice between the phrases "corruptly did an unlawful act" (malfeasance), "corruptly did a lawful act" (misfeasance) and "corruptly failed to do an act required by the duties of [his] [her] office" (nonfeasance).

*approval in Evans v. State*, 389 Md. 456, 479, 886 A.2d 562 (2005). Appellants do not appear to have preserved any challenges to their charging documents, which alleged that their actions were "unlawful and improper." It therefore appears that the State could have failed to prove that the impugned acts were unlawful, but nonetheless proved that the acts were improper. As such, the proof would have been consistent with the charging documents and consistent with both the trial court and the pattern jury instructions on misconduct in office.

## III.

 Next, appellants contend that the circuit court erred when it denied their motion for mistrial grounded on the State's failure to disclose various prior inconsistent statements under the law of *Brady v. Maryland* and Rule 4–263. Both *Brady* and the Maryland rules require the State to disclose its witnesses' inconsistent statements. *Conyers v. State*, 367 Md. 571, 600–01, 790 A.2d 15 (2002) (citing *Spicer v. Roxbury Corr. Inst.*, 194 F.3d 547, 557 (4th Cir.1999)); Rule 4–263(d)(6). Chief Judge Krauser, writing for our Court, recently set forth the standard of review for discovery sanctions in *Raynor v. State*, 201 Md.App. 209, 227–28, 29 A.3d 617 (2011):

> The remedy for a violation of the discovery rules is, in the first instance, within the sound discretion of the trial judge. Rule 4–263(n) provides a list of potential sanctions, including: ordering discovery of the undisclosed matter, granting a continuance, excluding evidence as to the undisclosed matter, granting a mistrial, or entering any other appropriate order. The rule does not require the court to take any action; it merely authorizes the court to act. Thus, the circuit court has the discretion to select an appropriate sanction, but also has the discretion to decide whether any sanction is at all necessary.

> But, in exercising its discretion regarding sanctions for discovery violations, a trial court should consider: (1) the reasons why the disclosure was not made; (2) the existence and amount of any prejudice to the opposing party; (3) the

feasibility of curing any prejudice with a continuance; and (4) any other relevant circumstances. Although the prosecutor's intent alone does not determine the appropriate sanction, bad faith on the part of the State can justify exclusion of evidence or serve as a factor in granting a harsher sanction. And, if the discovery violation irreparably prejudices the defendant, a mistrial may be required even for an unintentional violation.

The declaration of a mistrial, however, is an extraordinary act which should only be granted if necessary to serve the ends of justice. The most accepted view of discovery sanctions is that in fashioning a sanction, the court should impose the least severe sanction that is consistent with the purpose of the discovery rules. We have said that the purpose of the discovery rules is to give a defendant the necessary time to prepare a full and adequate defense. And the Court of Appeals has warned that, if a defendant declines a limited remedy that would serve the purpose of the discovery rules and instead seeks the greater windfall of an excessive sanction, the "double or nothing" gamble almost always yields "nothing."

(Internal citations and quotation marks omitted.)

We begin our analysis by noting that while appellants' counsel represented to us that the disputed prior statements are in the record, counsel has failed to cite any part of it that *actually sets forth* those statements. Instead, appellants have left us to read the transcription of arguments on this issue and compile some sketch of what was said from the attorneys' and court's second-hand accounts. This, alone, would provide us with sufficient reason to deny appellants' claims of error. *See* Maryland Rule 8–501(c) ("The record extract shall contain all parts of the record that are reasonably necessary for the determination of the questions presented by the appeal and any cross-appeal."); *see also Md. Reclamation Assocs., Inc. v. Harford County,* 414 Md. 1, 61 n. 13, 994 A.2d 842 (2010) ("[The Petitioner] has the responsibility to support its factual assertions by citing pages of the record extract."); *ACandS, Inc. v. Asner,* 344 Md. 155, 192, 686 A.2d 250 (1996) ("[T]he

appellate court has no duty independently to search through the record for error[.]"); *Pulte Home Corp. v. Parex, Inc.*, 174 Md.App. 681, 760–61, 923 A.2d 971 (2007) ("We decline to comb through the eight-volume, 3,876–page record extract to ascertain information that Parex should have provided[.]"). Notwithstanding appellants' failure to assist in this matter, we reviewed the record as best we could and still have found no reason to reverse the trial court's rulings.

 Appellants argue, first, that Woodland's statement to the State's attorneys that he had *not* seen Johnson's shoes thrown from the van should have been disclosed under Maryland Rule 4–263(d)(6) as an inconsistent statement. We agree with appellants that the trial court erred in holding that because the defense knew of *other* witness testimony that contradicted Woodland's statement, Rule 4–263 did not require the State to disclose Woodland's statement. The Rule's text requires disclosure of *all* inconsistent statements; thus, *any particular statement* that is inconsistent with *any other particular statement* must be disclosed. "Notice" of inconsistency derived from other witness statements does not remove the State's duty to disclose an inconsistent statement under the Rule as written. That said, the Rule's purpose is to assist the defendant in preparing a defense, and to protect the defendant from surprise. *Hutchins v. State,* 339 Md. 466, 473, 663 A.2d 1281 (1995). Thus, when we address the question of prejudice and remedy, we must consider that appellants were on notice, prior to trial, that Woodland's statements directly contradicted other witnesses. In that light, the trial court's ruling simply reflects its finding that appellants could have and should have developed the issue prior to trial, removing any offending prejudice. But those grounds are ultimately unnecessary for our disposition; once the defense was fully aware of the statements, they used them to impeach Woodland's testimony and obtained a "full and adequate defense." *Raynor,* 201 Md.App. at 227–28, 29 A.3d 617. We therefore cannot say that appellants' case was "irreparably prejudiced" against them. *See Davidson v. State,* 491 So.2d 1040, 1041 (Ala.Cr.App.1986) (no prejudice to defendant where witnesses'

pending charges were disclosed during direct and defendant impeached the witness on cross-examination); *Gardner v. State,* 296 Ark. 41, 55, 754 S.W.2d 518 (Ark.1988) (no prejudice where transcript was not disclosed but counsel effectively impeached by exposing prior inconsistent statement on cross-examination).

 Appellants also contend that the State should have disclosed Johnson's pretrial statements that he called 911 twice, and that the operator initially laughed and hung up before dispatching police on the second call. Here, appellants confuse two separate inconsistencies.

First, there is the question of whether Johnson made *two* calls to 911. It is undisputed that Johnson's phone records reflect two 911 calls, and it is not at all clear from the record whether he *actually stated* at any time prior to trial that he only made one call. The only portion of the record to which appellants cite is their attorneys' argument that the State's discovery production did not make them "aware" of two 911 calls. Without the substance of that discovery before us, there is no way to know whether they simply failed to appreciate that the State's disclosures were silent on the issue—and therefore consistent with Johnson's trial testimony—or whether there was some positive indication that only one call was made. There is thus every indication that Johnson did, in fact, call 911 twice, and appellants cite no record evidence that he ever contradicted himself in that regard.[17]

 Second, the trial transcript *does* reveal an inconsistency between the *contents* of Johnson's 911 calls, his recollection at trial, and—as far as we can tell from the State's concessions at trial—his statement to the State's attorney prior to trial.[18]

---

17. The only possible inconsistency we can glean from the record is between Johnson's trial testimony and what he had said to the State's attorney before trial. As this inconsistency obviously did not arise *until trial,* the State was not required to disclose the pretrial statements in discovery.

18. It is not known whether the transcript read aloud at trial corresponds to the first or second 911 call from Johnson's cell phone.

But as with Woodland's statements, the defense discovered the inconsistency at trial and was allowed a thorough cross-examination on it; furthermore, the trial court precluded the State from addressing the issue on redirect examination. Most importantly, the trial court granted the defense a one-day continuance to investigate and prepare its cross-examination. And although the investigation was not fruitful, the record indicates that any useful records would not have been available even if disclosure *had* been made *prior* to trial. For these reasons, the trial court's sanctions were the least severe sanction consistent with the purpose of the discovery rules, while a mistrial was not. *Raynor*, 201 Md.App. at 227–28, 29 A.3d 617. We therefore shall not disturb the trial court's ruling denying appellants' motions for mistrial.

## IV.

Lastly, appellants argue that the circuit court erred when it suspended the bench trial of their co-defendant, Hellen, and continued with appellants' jury trial and verdict. Appellants treat the court's ruling as a mid-trial severance [19] and argue that while prejudice in that context is usually the introduction of inadmissible evidence, "This court must determine whether the trial court abused its discretion as a result of the unfair prejudice ... [from] the lack of *admissible* evidence, which was received by the trial court after the jury verdict was rendered." (Emphasis added.) Appellants cite no authority for this proposition, which we assume is because the argument defies logic. The fact that prejudice results from introducing inadmissible evidence does not, in any way, imply that it results from the opposite circumstance. And no law

However, in the transcript, the operator neither hangs up (which Johnson alleged occurred during the first call) nor refers to a previous call (which Johnson alleged occurred in the second call). Thus, regardless of whether the 911 transcript reflects his first or second call, there is an inconsistency between it and Johnson's testimony.

19. The State disputes this characterization, but there is no need in this case to parse the difference between a mid-trial severance and denial of a motion to postpone Hellen's bench trial; our result would remain the same in either case.

that we know of entitles one defendant to another's evidence as a matter of right; appellants had the right only to *exclude inadmissible evidence* from their trial, an outcome *guaranteed* when the court postponed Hellen's bench trial and proceeded with appellants' jury trial. Moreover, appellants have not explained how or why the court's action prevented them from introducing favorable evidence from Hellen's bench trial.[20] The fact that Hellen received the benefit of appellants' evidence did not deprive them of any substantive rights.

**JUDGMENTS AFFIRMED. COSTS TO BE PAID BY 50% BY FRANCIS AND 50% BY SMITH.**

---

**20.** Again, this evidence is not in the record and here we rely on the appendix to appellants' brief and the State's summary in its brief. The appendix consists of four transcript pages (with at least one missing) that are not identified in appellants' brief except by implication. We understand these pages to be an excerpt of Hellen's postponed bench trial, and it shows that the entirety of his defense was three stipulations: the internet history of the computer that Hellen used in the police van; that the Internal Affairs Division had made no prior "sustained findings" against him; and that three witnesses would have testified to his good character. Appellants have failed, in their substantive arguments, to demonstrate how or why this evidence was relevant to *their* case. Further, if we assume the evidence would have benefitted appellants, they still have not explained why *they* did not introduce that evidence in their defense. Finally, we note that Hellen's counsel stated that his client decided not to testify because his case had been continued. But again, appellants have not explained why Hellen could not have been called to testify during their defense.